Bruce Wayne MORRIS, Petitioner–
Appellant,

v.

Jeanne WOODFORD, Acting Warden
of California State Prison at San
Quentin, Respondent–Appellee.

Bruce Wayne Morris, Petitioner,

v.

United States District Court, Eastern
District of California (Sacramento),
Respondent,

Jeanne Woodford, Warden, San
Quentin Prison, Real Party
in Interest.

Nos. 99–99028, 01–71622.

United States Court of Appeals,
Ninth Circuit.

Submitted Nov. 16, 2001.*

Filed Dec. 6, 2001

* The panel unanimously finds these cases suitable for decision without further oral argument. Fed. R.App. P. 34(a)(2).

Marianne D. Bachers, San Francisco, California; and Tony Tamburello, Tamburello, Hanlon & Waggener, San Francisco, California, for the petitioner-appellant.

Ward A. Campbell, Deputy Attorney General, Sacramento, California, for the respondent-appellee.

Before: FERGUSON, GRABER, and W. FLETCHER, Circuit Judges.

Petition for Writ of Mandamus

GRABER, Circuit Judge:

More than a year ago, we granted a certificate of appealability (COA) on several issues raised by Petitioner Bruce Wayne Morris in this 28 U.S.C. § 2254 action but, in the interest of judicial economy, we remanded the case for an evidentiary hearing on certain of his claims. *Morris v. Woodford,* 229 F.3d 775, 781 (9th Cir.2000), *cert. denied,* —— U.S. ——, 121 S.Ct. 2238, 150 L.Ed.2d 227 (2001). For a variety of reasons, no hearing has yet taken place. The judicial economy that we sought to achieve has not materialized. Petitioner's lawyers have filed a writ of mandamus to compel a stay of proceedings in the district court. The writ is granted. In the interest of justice, we have recalled the mandate and issue this opinion on the merits.

We affirm the district court's grant of summary judgment with respect to the guilt-phase issues that are ripe for our review. We leave undecided those guilt-phase issues that are not yet ripe. With respect to the penalty phase, we reverse and remand with instructions to vacate Petitioner's sentence of death and order a new penalty-phase trial.

## FACTUAL AND PROCEDURAL BACKGROUND

Petitioner was indicted for the 1985 murder of Rickey Van Zandt.[1] He was

---

1. Petitioner calls the victim "VanZant" in his petition and "Van Zant" in his briefs to this court. The California Supreme Court, the magistrate judge, the district court, and the state spell the victim's name "Van Zandt"

tried in front of a jury. The state's theory of the case was that Petitioner killed Van Zandt as part of a plot to steal his van. The state introduced evidence to demonstrate the following: Petitioner, his girlfriend Avette Barrett, and her sister, Allison Eckstrom, were hitchhiking from Sacramento to Lake Tahoe. Van Zandt picked them up. Petitioner formulated a plan to steal Van Zandt's van. At night, while Van Zandt was sleeping in the van, Petitioner beat him with a rock until he was unconscious. Petitioner then took Van Zandt from the van and rolled him down a hill. Upon discovering that Van Zandt still was alive, Petitioner beat him to death with a stick.

Petitioner and the two women then drove around the western United States in Van Zandt's van, making purchases with the victim's credit cards. Eventually they arrived in Nebraska, where they picked up a hitchhiker, Tom Logan. Petitioner told Logan that he had killed Van Zandt in order to steal the van, stating that he had "really rocked and rolled him." Later, Petitioner told Logan that he had been "kind of coerced" into killing Van Zandt by Barrett.

Logan fled and called the police, who arrested Petitioner, Barrett, and Eckstrom the next day. Among the items that the police seized after the arrest were Petitioner's jeans, which were splattered with blood above the knees.

Shortly after he was arrested, Petitioner asked to speak to an officer. He was advised of his constitutional rights and agreed to make a statement. Before he made the statement, he was allowed to talk to Barrett; he told her that he would not "let [her] suffer for something [she] didn't do."

Officers then interviewed Petitioner for approximately one hour. During the interview, Petitioner admitted that he had hit Van Zandt on the head between 12 and 14 times with a rock the size of a softball. He stated that he might have talked beforehand about killing Van Zandt to steal his van, but later stated that he had only wanted to knock Van Zandt out and tie him up. He further stated that Barrett and Eckstrom had told him not to do anything to Van Zandt, but that he had responded that they should "take off" while he "finished what [he was] going to do." Finally, he told officers that, after Barrett and Eckstrom left, he "knocked the man out and pulled him off to the side of the hill" and that he hit Van Zandt with a stick when Van Zandt started to get up.

Later, while Petitioner was in custody in California, he wrote a letter to Barrett, which prison officials intercepted. That letter read, in part: "I've killed once for you, and if I have to I'll do it again!!! And you know that I can, and I don't need a rock to do it either." The state also produced evidence that, while he was in the Sierra County jail, Petitioner told two fellow inmates that he had hit a man's skull with a rock 13 times.

Testifying in his own defense at trial, Petitioner denied killing Van Zandt and stated that he had admitted to the killing in an effort to protect Barrett and Eckstrom. His story was that he had returned to the van after fishing to find Barrett and Eckstrom upset. Both had blood on their dresses. Petitioner testified that Barrett told him she had struck Van Zandt with a rock in self-defense when he tried to rape her. According to Petitioner, he then found Van Zandt unconscious but alive in the van and pulled him out. Then Eckstrom struck Van Zandt with a stick, killing him.

and, accordingly, we use that spelling in this opinion.

Petitioner also called an expert who testified that she had found traces of semen on Van Zandt's underwear. The expert was unable to state, however, when or how the semen had been deposited.

Finally, Petitioner called three female inmates who had been housed in the Nevada County jail with Barrett. Those inmates testified to statements by Barrett implying that Petitioner was accepting responsibility for Van Zandt's killing out of love for Barrett. All conceded, however, that Barrett had made inconsistent statements about the killing.

The jury found Petitioner guilty of first-degree murder and robbery and further found the special circumstance that Petitioner had committed the murder during the commission of the robbery. At the penalty phase, the jury sentenced Petitioner to death. The subsequent procedural history of the case is detailed in our earlier opinion. *Morris*, 229 F.3d at 777–78.

## STANDARD OF REVIEW

■ This court reviews de novo a district court's decision to deny a petition under 28 U.S.C. § 2254. *McNab v. Kok*, 170 F.3d 1246, 1247 (9th Cir.1999) (per curiam). Because Petitioner filed his petition before the effective date of the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), the provisions of that Act do not apply to the merits of this appeal. *Ainsworth v. Calderon*, 138 F.3d 787, 790 (9th Cir.), *amended on denial of reh'g*, 152 F.3d 1223 (9th Cir.1998).

## DISCUSSION

### A. *Guilt–Phase Claims*

#### 1. *Claim 24: Alleged Caldwell Error*

When the jury venire appeared for voir dire, the trial court said to the prospective jurors:

As far as the process is concerned, let me explain a little about that. You need not, and will not, have to worry about the death penalty in the event that you find, first of all, that there was not a murder or that the murder wasn't in the first degree.

.    .    .    .    .

You may never get to that point, but we still have to talk to you about how you feel about the death penalty.

The supreme court, for the last 56 cases that they have decided about the death penalty, and I'm sure all of you have read about the supreme court. There have been 56 cases, ladies and gentlemen, since 1972, I believe, that have talked about the death penalty cases. Fifty-three of them were reversed, three of them were affirmed.

In those cases, we were given guidelines. I, as a trial judge, was given guidelines as to how we talk to you about this matter. Those guidelines are still in effect. I'm still bound by them and so are you. None of us are above that law.

So I have to talk to you about how you feel about the death penalty.

Later, outside the presence of the jury, defense counsel objected to that statement, arguing that it might cause some jurors to treat their death-penalty deliberations as "an academic exercise" in view of the possibility of reversal. The court agreed that the statement was inappropriate and asked defense counsel what he thought the court should do. Counsel responded: "We would ask for an admonishment because with the new court [three members of the California Supreme Court recently had been recalled], death may very well mean exactly that." Counsel did not ask the court to replace the jury venire to which the statement had been made.

The court agreed to admonish the prospective jurors. When they returned, the court told them:

Ladies and gentlemen, I have been requested to admonish you a little bit about what I said in the beginning concerning the amount of cases heard by the supreme court, 56, I believe I mentioned in number and reversals thereon.

The Court, me, personally, did not mean to indicate to you one way or the other how I felt about that matter. The Court only wanted to indicate to you that those 56 cases gave us guidelines, which I am obligated—and I think I told you that, that I'm obligated to follow in cases of this nature. And that's all I intended to do. I did not intend to indicate my favor or disfavor of those decisions. I only indicated it was a threshold, the comment concerning the guidelines, that we have to follow.

And now I'm going to tell you about those guidelines.

Defense counsel did not object to the admonition, move for a mistrial, or otherwise indicate further concern about this matter until direct appeal.

On direct appeal, Petitioner argued that the court's statement minimized the jury's sense of responsibility for the death sentence by improperly suggesting that such a sentence likely would be reversed. That improper suggestion, Petitioner contended, denied him due process under *Caldwell v. Mississippi*, 472 U.S. 320, 328–29, 105 S.Ct. 2633, 86 L.Ed.2d 231 (1985) (holding that prosecutor's comments suggesting that appellate court, not jury, was final determiner of death sentence denied the petitioner due process). The California Supreme Court agreed that the statement was irrelevant and improper but concluded that it was not prejudicial in the light of the admonition, the remainder of the trial court's comments, and the jury instruc-

tions. *People v. Morris*, 53 Cal.3d 152, 279 Cal.Rptr. 720, 807 P.2d 949, 963–64 (1991).

Petitioner raised the issue again in claim 24 of his federal habeas petition. The magistrate judge concluded, as had the California Supreme Court, that the trial court's "potentially very serious mistake" was not prejudicial in view of the court's subsequent admonition and the jury instructions. The district court adopted that conclusion.

In this appeal, Petitioner recounts the court's initial statement (without mentioning the later admonition) and argues:

The trial judge made this observation just months after the highly contentious general election in which the state supreme court's death penalty jurisprudence, and specifically the leadership of Chief Justice Rose [Bird] with respect to capital appeals, was at issue. Petitioner contends that these comments are a part of the cumulative prejudice requiring reversal of the judgments in this case.

We are not persuaded.

■ While unfortunate, the trial court's comment was relatively mild, especially when viewed in the context of the trial as a whole. The court recognized its mistake almost immediately, asked defense counsel how to cure the error, and did what counsel asked. Further, the jury was instructed during the penalty phase that "a death verdict means exactly what it says. That the defendant will be executed. For you to conclude otherwise would be to rely upon speculation or conjecture and would be a violation of your oath as a juror."

In the circumstances, the district court did not err in granting summary judgment against Petitioner on claim 24.

2. *Claims 1, 2, and 14: Accomplice Arguments*

In claims 1, 2, and 14 of his petition, Petitioner raised a number of arguments

concerning his accomplices, Barrett and Eckstrom. The district court rejected all those claims. We granted a COA on two issues—whether the jury instructions on accomplice liability deprived Petitioner of a fair trial and whether the accomplices' plea agreements were unduly coercive.

### (a) *Jury Instruction: Accomplice Liability*

Petitioner argues that the trial court's guilt-phase instruction concerning accomplice liability deprived him of a fair trial. Specifically, he contends that the trial court's instruction "precluded the jury from giving any meaningful evidentiary consideration to Petitioner's guilt phase defense—in effect, a verdict was directed against him on the issue of actual perpetration of the homicide."

As noted, Petitioner's primary guilt-phase argument was that Barrett had killed Van Zandt. Barrett and Eckstrom testified that Petitioner had killed Van Zandt. Petitioner requested the following jury instruction concerning accomplice liability:

An accomplice is a person involved in the commission of the offense charged against the defendant whether by directly committing the act constituting the offense or aiding and abetting in its commission. A person can be an accomplice even though the acts were committed at a different time and place than the acts charged against the defendant.

The district court declined to give that instruction. Instead, the court instructed the jury as follows on the issue of accomplice testimony (the particular instruction to which Petitioner objects is underlined):

An accomplice is one who is subject to prosecution for the identical offense charged against the defendant on trial.

To be an accomplice, the person must have aided, promoted, encouraged or instigated by act or advice the commission of such offense with knowledge of the unlawful purpose of the person that committed the offense and with the intent or purpose of committing, encouraging or facilitating the commission of the offense.

A defendant cannot be found guilty based upon the testimony of an accomplice unless such testimony is corroborated by other evidence which tends to connect such defendant with the commission of the offense.

To corroborate the testimony of an accomplice there must be evidence of some act or fact related to the offense which, if believed by itself, and without any aid, interpretation or direction from the testimony of the accomplice tends to connect the defendant with the commission of the offense charged.

However, it is not necessary that the evidence of corroboration be sufficient in itself to establish every element of the offense charged or that it corroborate every fact to which the accomplice testified.

In determining whether an accomplice has been corroborated, you must first assume the testimony of the accomplice has been removed from the case. You must then determine whether there is any remaining evidence which tends to connect the defendant with the commission of the offense.

If there is not such independent evidence which tends to connect the defendant with the commission of the offense, the testimony of the accomplice is not corroborated.

If there is such independent evidence which you believe, then the testimony of the accomplice is corroborated.

The required corroboration of the testimony of an accomplice may not be

supplied by the testimony of any or all of his accomplices, but must come from other evidence.

Merely assenting to or aiding or assisting in the commission of a crime without knowledge of the unlawful purpose of the perpetrator is not criminal. And a person so assenting to or aiding and assisting in the commission of a crime without such knowledge is not an accomplice in the commission of such crime.

*If the crimes of robbery and murder were committed by anyone, the witness' [sic], Avette Barrett and Allison Eckstrom, were accomplices as a matter or law, and their testimony is subject to the rule requiring corroboration.*

The testimony of an accomplice ought to be viewed with distrust and received with care, caution and suspicion for the reason that its very source is tainted.

Petitioner argues, as he has throughout these proceedings, that the emphasized part of the instruction "explicitly and impliedly told the jurors that Barrett and Eckstrom were witnesses and assistants to Petitioner—in other words, they were to give no consideration to Petitioner's argument that they killed Van [Zandt], and that he did not." That is, he reads the phrase "the witness' [sic], Avette Barrett and Allison Eckstrom" to refer to the two as *witnesses at the crime scene,* rather than as *witnesses at trial.*

On direct appeal, the California Supreme Court concluded that the challenged instruction was not erroneous and that, even if the instruction was erroneous, the error was harmless in view of the overwhelming evidence of Petitioner's guilt. *Morris,* 279 Cal.Rptr. 720, 807 P.2d at 983. In this proceeding, the magistrate judge concluded that the instruction was not improper, and the district court adopted the magistrate judge's conclusion.

■ When considering an allegedly erroneous jury instruction in a habeas proceeding, an appellate court first considers whether the error in the challenged instruction, if any, amounted to "constitutional error." *Calderon v. Coleman,* 525 U.S. 141, 146, 119 S.Ct. 500, 142 L.Ed.2d 521 (1998). If so, the court then considers whether the error was harmless. *Id.* at 145, 119 S.Ct. 500.

■ The test for "constitutional error" is set out in *Boyde v. California,* 494 U.S. 370, 380, 110 S.Ct. 1190, 108 L.Ed.2d 316 (1990). To determine whether constitutional error occurred, an appellate court asks "whether there is a reasonable likelihood that the jury has applied the challenged instruction in a way that prevents the consideration of constitutionally relevant evidence." *Id.* That inquiry also can be described as having two parts: (1) whether there is a reasonable likelihood that the jury understood an assertedly ambiguous instruction to mean what the defendant suggests it means; and (2) if so, "whether the instruction, so understood, was unconstitutional as applied to the defendant." *Coleman,* 525 U.S. at 147, 119 S.Ct. 500.

■ If the court finds constitutional error, then it applies the test for harmless error from *Brecht v. Abrahamson,* 507 U.S. 619, 113 S.Ct. 1710, 123 L.Ed.2d 353 (1993). Under *Brecht,* the appellate court considers whether the error had a " 'substantial and injurious effect or influence in determining the jury's verdict.' " *Id.* at 637, 113 S.Ct. 1710 (quoting *Kotteakos v. United States,* 328 U.S. 750, 776, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946)). "If we are in grave doubt as to whether the error had such an effect, the petitioner is entitled to the writ." *Coleman v. Calderon,* 210 F.3d 1047, 1051 (9th Cir.2000).

Turning to the bedrock requirement of "constitutional error," Petitioner argues that the challenged instruction was reasonably likely to be understood by the jury to declare that, as a matter of law, Barrett and Eckstrom were "assistants" and "witnesses" during the murder of Van Zandt. Therefore, Petitioner argues, the instruction precluded the jury from considering his defense that Barrett and Eckstrom actually beat Van Zandt to death.

■ We agree with the magistrate judge and the district court that the jury was not "reasonably likely" to interpret the instruction in that manner. "A single instruction is not viewed in isolation, but in the context of the overall charge." *United States v. Harrison,* 34 F.3d 886, 889 (9th Cir.1994). The challenged instruction was one in a long series of instructions about accomplice testimony. In context, it is reasonably apparent that the series of instructions referred to the *trial testimony* of Barrett and Eckstrom; there was no other witness at trial who reasonably could be viewed as Petitioner's "accomplice." In context, the most reasonable construction that the jury could have given to the trial court's phrase "the witness' [sic], Avette Barrett and Allison Eckstrom" was "the two women who appeared as witnesses in this trial and whose testimony I am in the middle of talking to you about, Avette Barrett and Allison Eckstrom." Petitioner's proffered construction of that phrase—"the witnesses to the crime, Avette Barrett and Allison Eckstrom"— does not fit with the surrounding instructions and is not "reasonably likely" in view of the charge as a whole.

Nor is it reasonably likely that the jury understood the instruction to mean that they were required to view the two women as "assistants" and Petitioner as the "actual perpetrator." Petitioner substitutes the word "assistant" for "accomplice," but the instructions do not use the word "assistant." Rather, the instructions state, among other things, that an accomplice "is one who is subject to prosecution for the identical offense charged against the defendant"; that a person may be an accomplice as the result of having "aided, promoted, encouraged or instigated by act or advice the commission of such offense"; that an accomplice must have "the intent or purpose of *committing, encouraging or facilitating* the offense"; and that, "if the crimes of robbery and murder were committed *by anyone,*" Barrett and Eckstrom were accomplices, and their testimony required collaboration. (Emphasis added.) Viewing the instructions as a whole, the instructions do not state that the jury was required as a matter of law to view the two women as "assistants." Rather, they correctly instruct that if the two women had *any* active role in the crime—including, of course, actually killing Van Zandt—their testimony required corroboration. There is no reasonable likelihood that any juror would have understood the challenged instruction in the manner Petitioner proposes, as directing a verdict "against him on the issue of actual perpetration of the homicide." Accordingly, there was no error, and a fortiori, no "constitutional error."

### (b) *Accomplices' Plea Agreements*

Petitioner argues that Barrett's and Eckstrom's plea agreements rendered his conviction unconstitutional. According to Petitioner, the agreements required Barrett and Eckstrom to give specific testimony implicating Petitioner, regardless of the truth or falsity of that testimony.

Barrett signed a plea agreement in January 1986. That agreement originally contained eight conditions: (1) that Barrett's representation that she did not personally injure Van Zandt was true; (2) that Bar-

rett would be released on her own recognizance; (3) that Barrett would agree to "waive time for the commencement of the . . . action pending against her" in county court; (4) that Barrett would make herself available to receive subpoenas and to take a polygraph examination; (5) that Barrett would "testif[y] completely and truthfully at all proceedings including preliminary examination and trial concerning all the facts and circumstances surrounding the killing and death of Rick[e]y Van Zandt"; (6) that Barrett would not exercise her right to remain silent during the proceedings; (7) that Barrett would take and pass a lie detector test; and (8) that Barrett would remain in California and inform the district attorney of her address. The agreement provided that if condition No. 1 were not met, or if Barrett violated any condition of the agreement, the agreement would be void. If Barrett complied with the terms of the agreement, the district attorney agreed that, after Petitioner's trial, all charges against Barrett would be dropped, with the exception of a single count of felony vehicle theft to which Barrett would plead guilty.

Eckstrom's plea agreement was similar but not identical. She received transactional immunity in exchange for her testimony. The other major difference between her agreement and Barrett's was that Eckstrom's agreement did not require her to take a polygraph test.

Before Barrett testified, the state amended her agreement to remove the condition that she not have personally inflicted any injuries on Van Zandt. That condition remained in Eckstrom's agreement.

After the prosecution and the defense both mentioned the agreements during opening argument, Petitioner sought to have the agreements admitted into evidence. The trial court admitted Eckstrom's agreement and read to the jury Barrett's agreement, which had been modified by the deletion of condition No. 1 (the requirement that Barrett not have injured Van Zandt) and condition No. 7 (the polygraph requirement).[2] At trial, defense counsel cross-examined Barrett and Eckstrom about the agreements and discussed the agreements in jury arguments during both the guilt and penalty phases.

Petitioner argued on direct appeal that the agreements were coercive and rendered Barrett's and Eckstrom's testimony unreliable and inadmissible. The California Supreme Court rejected that argument. *Morris,* 279 Cal.Rptr. 720, 807 P.2d at 970. As to Barrett, the court concluded that the agreement did not taint her testimony because the no-injury condition had been removed from the agreement before trial. The only remaining condition that bore on her testimony was the condition that she testify completely and truthfully, which condition, the court concluded, was neither coercive nor improper. *Id.*

As to Eckstrom, the court declined to reach the question whether the no-injury provision in her agreement rendered the agreement impermissibly coercive. Instead, the court concluded that, even if her testimony was improperly admitted, Petitioner was not prejudiced by the error. In that regard, the court noted that Eckstrom's testimony was not central to the state's case against Petitioner. Instead, the court concluded: "[Petitioner's] several detailed pretrial admissions of guilt were the cornerstone of the case against him." *Id.* The court reasoned:

> Even if the accomplice testimony is set aside, it remains that [Petitioner] voluntarily and unequivocally confessed his

2. The trial court had held that all evidence regarding polygraph tests was inadmissible.

guilt three times: once to a hitchhiker he picked up in Nebraska, once in a detailed statement to Nebraska law enforcement officers, and once in a letter to Avette Barrett. The remaining evidence corroborates the confessions.... [T]he evidence of [Petitioner's] guilt was overwhelming and any error in admitting the accomplice testimony was harmless beyond a reasonable doubt.

*Id.* at 971 n. 5.

Petitioner argued in his federal habeas petition that the plea agreements induced Barrett and Eckstrom to give false testimony. The magistrate judge rejected that argument, concluding (1) that the deletion of the no-injury clause from Barrett's agreement before trial removed any potentially coercive element from the agreement; and (2) that, although Eckstrom's plea agreement contained the no-injury clause and therefore "violate[d] due process in the abstract," the error in admitting her testimony was harmless in view of the overwhelming evidence of Petitioner's guilt. The district court adopted the magistrate judge's recommendation and rejected Petitioner's claim.

■ On appeal, Petitioner again asserts that the prosecutor bargained for specific testimony about the crime, rather than for the truth. He also argues that the removal of the no-injury condition from Barrett's agreement renders the agreement "illusory," because Barrett received "all the benefits but none of the burdens of the plea contract."

■ "The general rule is that an accomplice who has pled guilty may testify against non-pleading defendants without raising due process concerns." *United States v. Yarbrough*, 852 F.2d 1522, 1537 (9th Cir.1988). Generally, such testimony will be admitted "if the jury is informed of the exact nature of the agreement, defense counsel is permitted to cross-examine the accomplice about the agreement, and the jury is instructed to weigh the accomplice's testimony with care." *Id.* Those conditions were satisfied here. In addition, a plea agreement may require an accomplice to testify fully and truthfully without violating the Due Process Clause. *Gallego v. McDaniel,* 124 F.3d 1065, 1078 (9th Cir. 1997).

■ Here, both plea agreements required the accomplices to testify truthfully. But, even assuming that it was error to admit their testimony, the error was harmless beyond a reasonable doubt. Petitioner asserts that his trial boiled down to a "swearing contest," with Barrett and Eckstrom blaming Petitioner for the murder, and Petitioner blaming Barrett and Eckstrom. That view of the trial ignores the most damning evidence of Petitioner's guilt: his own admissions. For example, Petitioner told hitchhiker Logan that he had killed Van Zandt in order to steal his van and that he had "really rocked and rolled him." Next, Petitioner confessed to police officers that he had hit Van Zandt on the head between 12 and 14 times with a rock that was the size of a softball, might have talked beforehand about killing him so as to steal the van, and had told Barrett and Eckstrom to leave while he finished killing Van Zandt with a stick. Not long after that, Petitioner wrote a letter to Barrett, which proclaimed: "I've killed once for you, and if I have to I'll do it again!!! And you know that I can, and I don't need a rock to do it either." Then Petitioner told two fellow inmates that he had hit a man's skull with a rock 13 times.

Even if Barrett and Eckstrom had never testified, the jury would have been left to consider those admissions—and the corroborating physical evidence, such as Petitioner's blood-spattered clothing—in the light of Petitioner's proffered explanation

that he had lied about committing the crime to protect Barrett. That explanation is particularly specious when applied to the statements that Petitioner made to Barrett herself. As the California Supreme Court majority noted, Petitioner's own admissions were the "cornerstone" of the state's case and constitute unusually strong evidence of guilt. *Morris*, 279 Cal. Rptr. 720, 807 P.2d at 970.

In sum, we affirm the district court's grant of summary judgment on this claim. Any error was harmless.

## B. *Penalty–Phase Claim*

During the penalty phase, Petitioner requested that the court give an instruction concerning the jurors' sentencing responsibilities. That instruction—special instruction 60—contained a typographical error. As written, the instruction read:

> If you have a reasonable doubt as to which penalty to impose, death or life in prison without the possibility of parole, you must give the defendant the benefit of that doubt and return a verdict fixing the penalty of life in prison *with* the possibility of parole.

(Emphasis added.) The emphasized word in the instruction should have been "without"—not "with"; life *without* parole and death are the only two sentences that California law authorized for aggravated murder under special circumstances. The trial court read the instruction, including the error, to counsel, during discussions about the penalty-phase instructions. Unfortunately, neither counsel nor the court noticed the mistake.[3]

The court agreed to give special instruction 60. When reading that instruction aloud to the jury, the court corrected the mistake, apparently unconsciously, stating:

> If you have a reasonable doubt as to which penalty to impose, death or life in prison without the possibility of parole, you must give the defendant the benefit of that doubt and return a verdict, fixing the penalty of life in prison *with* the possibility of—*without* the possibility of parole.

(Emphasis added.) Unfortunately, the court did not correct the written instruction before submitting it to the jury for their use during deliberations.

After deliberating for a time, the jury sent the trial court a written inquiry: "In the event this jury cannot decide 100% on the penalty phase of this case what would be the sentence imposed? Please explain noted page of instructions [special instruction 60]."

The court asked that the jury be brought in, and the following colloquy took place between the court and the jury foreman, in the presence of the rest of the jury panel:

> THE COURT: Mr. Lewis, the Court has been in receipt of your question—or questions.
>
> And before I respond to the questions, I have discussed them with counsel as well.
>
> Without telling me exactly how the jury stands one way or the other, can you give me some idea or give us an idea about the numerical count, how might it stand? Seven/five, six/six, four/eight?
>
> JUROR LEWIS: Approximately ten to two, Your Honor.

---

3. The trial court made a specific finding that the mistake in the instruction was just that, a mistake, and not a deliberate act on the part of defense counsel. The California Supreme Court agreed and concluded on that basis that the error was not "invited" by Petitioner. *Morris*, 279 Cal.Rptr. 720, 807 P.2d at 995 n. 22. The state does not challenge the trial court's factual finding of mistake, and we accept it as true.

THE COURT: Do you feel as though if I allow you to continue to deliberate, you might be able to reach a decision in the matter?

JUROR LEWIS: I think there's a possibility, Your Honor.

THE COURT: I'm going to let you do that. The statutes provide for what happens in the event that you folks aren't able to reach a decision, but I can't tell you what that is at this point in time.

So that's the answer to your first question. I am unable to tell you.

The answer to the second question is that I feel as though the instruction itself is self-explanatory. And we would hope with that in mind, that you might be able to reach a decision.

I suggest that you take as long as you might want to take. Don't rush. Please, do not rush, all right?

JUROR LEWIS: Thank you, Your Honor.

THE COURT: You are welcome.

After that colloquy, the jury resumed its deliberations and eventually returned a sentence of death. The mistake in special instruction 60 was not discovered until after the jury's verdict was received. When the error was discovered, Petitioner moved to set aside the verdict. The trial court denied the motion.

The penalty-phase jury instructions repeatedly stated that the only possible sentences that the jury could impose were death or life without parole. For example, the jury was instructed:

It is the law of this state that the penalty for a defendant found guilty of murder in the first degree shall be death or confinement in the state prison for life without possibility of parole in any case in which the special circumstance charged in this case has been specially found to be true.

The jury also was instructed:

You are instructed that life without parole, that verdict, means exactly what it says. That the defendant shall be imprisoned for the rest of his life.

And when reading the instructions to the jury, the trial court began by informing the jury that it could have written copies of the instructions if it wished but,

[i]n the event there are any delineations or modifications, you are not to take that into considers [sic]. You are only to take the text as read to you as follows.

Finally, the jury was given only two verdict forms, one for the verdict of death, and one for the verdict of life without parole.

On direct appeal, Petitioner argued that the erroneous instruction clearly confused the jurors and led them to believe that, if they could not *unanimously* agree on a verdict, then Petitioner would receive life *with* the possibility of parole. The California Supreme Court rejected that argument. *Morris,* 279 Cal.Rptr. 720, 807 P.2d at 998. In rejecting the argument, the court concluded that (1) the jury had merely asked for a *general explanation* of special instruction 60, and there was no way to know whether they were confused by the typographical error or by some other aspect of the instruction, *id.* at 996; (2) Petitioner's interpretation of the mistyped instruction was "physically impossible" because the jury was not given a "life with parole" verdict form, *id.;* (3) Petitioner's interpretation was "logically inconsistent" because the jury repeatedly had been informed that the only possible verdicts were death and life without parole, *id.* at 997–98; and (4) the error was only in the typewritten copy of the instructions, and the jury was instructed that the text of the

instruction *as read* controlled over any "delineations or modifications" in the typewritten instruction, *id.* at 997.

Justices Mosk and Broussard dissented separately. Justice Broussard's dissent contains a long discussion of this claim, which includes the following observation:

> [T]he majority fail to see the potential connection between the erroneous instruction and the jury's simultaneous inquiry with regard to the consequences of a jury deadlock. The jury did not need to interpret the special instruction literally in order to prejudice [Petitioner]. *As noted, the jurors were obviously concerned about the effect of a deadlock on [Petitioner's] future; one or more jurors may have feared, in light of the erroneous instruction, that if the jury was unable to arrive at a unanimous decision the court might be required, by the unspecified statute to which the court referred, to sentence [Petitioner] to life imprisonment with the possibility of parole.* In my view, this is a plausible, perhaps even a likely, explanation of why the jury asked what sentence would be imposed in the event of a deadlock and for an explanation of special instruction No. 60.

*Id.* at 1005 (emphasis added).

Petitioner made that argument to the district court in claims 36 and 40 of his federal habeas petition. The magistrate judge agreed with Petitioner's argument and recommended that the case be remanded for a new penalty phase. The magistrate judge concluded that the issue was controlled by *McDowell v. Calderon,* 130 F.3d 833, 837–38 (9th Cir.1997) (en banc), in which this court held that the trial court's failure to explain a correct jury instruction to an obviously confused penalty-phase jury violated the Eighth Amendment.[4]

The district court rejected the magistrate judge's recommendation and held that the mistyped instruction did not rise to the level of constitutional error. The court observed that the jury did not indicate a *specific* concern or question about the instruction, but merely asked for a general explanation. Nor did the jury return with "a follow-up question, which would have been evidence of juror confusion." In view of the totality of the circumstances, the court reasoned, "the assumption must be" that "the jurors, through their collective debate and discussion, reached the inevitable conclusion that the instruction contained a typographical error." Further, the court concluded that, even if there was constitutional error, the error was harmless.

Because Petitioner is arguing that he was prejudiced by an allegedly ambiguous jury instruction, this issue is analyzed under the two-step process set out in *Coleman,* 525 U.S. at 146, 119 S.Ct. 500. As noted, *Coleman* requires us to decide (1) whether the asserted error was "constitutional error" under *Boyde;* and (2) if so, whether the error was harmless under *Brecht.*

■ Petitioner argues, first, that there is a reasonable likelihood that some or all of the jurors understood special instruction

---

**4.** In *Weeks v. Angelone,* 528 U.S. 225, 120 S.Ct. 727, 732–33, 145 L.Ed.2d 727 (2000), the Supreme Court reached the opposite conclusion on essentially the same facts (during penalty-phase deliberations, jurors informed the trial court that they were confused by a correctly typed and constitutionally adequate instruction, and the judge directed them only to look at the text of the instruction). *Weeks* appears to overrule *McDowell. See also Coleman v. Calderon,* 210 F.3d 1047, 1049 n. 1 (9th Cir.2000) (acknowledging that *McDowell* implicitly was overruled on another issue by the Supreme Court's decision in *Calderon v. Coleman,* 525 U.S. 141, 146, 119 S.Ct. 500, 142 L.Ed.2d 521 (1998)).

60 to mean that, if they could not agree unanimously on a penalty, then Petitioner would receive life *with* parole. We agree. That is the most logical inference that can be drawn from their question to the trial court. When they presented their question to the court, they had reached an initial impasse; they could not unanimously agree whether Petitioner should receive death or life without parole. So they asked the court "what would be the sentence imposed" if they could not unanimously agree. At the same time, they asked for clarification of special instruction 60.

Because they asked about that instruction at the same time that they asked about the effect of a deadlock, it is logical to assume that they thought that instruction 60 spoke to the issue of deadlock. After all, no other penalty-phase instructions contained an explanation of what happens in the event of a deadlock; understandably, the jurors were not instructed that, if they were unable to make this terribly difficult decision, they would be sent home and the state would try again with a new jury. And it is clear from their first inquiry to the court that they believed that Petitioner would receive *some* sentence (rather than a new penalty-phase trial) if they deadlocked. Recall that their question was not "what will happen if we cannot agree 100%," but, rather, *"what would be the sentence imposed"* in those circumstances. (Emphasis added.)

Special instruction 60 can be read as answering that question. The instruction is directed to individual jurors and instructs them that, if they have reasonable doubt about the appropriate sentence, they should impose the lesser sentence. But, if the instruction is read as applying not to individual jurors *but to the jury as a whole*, then it has a somewhat different import. So read, it appears to state that, *if the jury as a whole* cannot decide on the appropriate sentence, then it *must* impose a particular sentence. In other words, the instruction can be read as a "deadlock instruction" that informs the jurors of the consequences if the jury cannot agree unanimously on a punishment.

So, it is clear that the jurors initially were deadlocked and that they did not know what would happen if they remained deadlocked. And it appears likely that they thought that special instruction 60 was relevant to that question. It is also apparent that they were confused by the instruction, and rightly so; they repeatedly had been instructed that the only sentences available to them were death and life *without* parole, but the instruction as typed appeared to provide that, if they could not choose one of those sentences, then Petitioner would receive life *with* parole.

The jurors took their questions to the trial court, which unwittingly exacerbated the problem. First, in response to the jurors' question about what would happen if they deadlocked, the court (properly) urged them to go back and try again to reach a unanimous verdict. The court also informed them that "[t]he statutes provide for what happens in the event that you folks aren't able to reach a decision, but I can't tell you what that is at this point in time." Second, in response to their request for clarification of special instruction 60, the court stated that "the instruction itself is self-explanatory. And we hope that with that in mind, that you might be able to reach a decision." In sum, the court informed the jury that (1) there was a consequence if they came back deadlocked; (2) the consequence was mandated by "statutes"; (3) the court would not tell them what the consequence was; (4) the mistyped jury instruction was self-explana-

tory; and (5) "with that in mind," they should try to reach a decision.

In the circumstances, there is a reasonable likelihood that one or more of the jurors interpreted the instruction as Petitioner suggests. If the instruction is deemed to be self-explanatory, then clearly it can be read to mean that, if the jury cannot choose between penalty A and penalty B, the court would impose penalty C. If one or more jurors understood the instruction in that manner, then the error is of constitutional significance. So understood, the instruction would suggest to any holdout juror that, if he or she did not join the majority of the other jurors, then Petitioner would be eligible for parole. That suggestion is, of course, incorrect, and its coercive potential is obvious; in effect, it would place such a juror in the apparent position of choosing between death and life *with* parole.

The state presents several arguments in opposition to Petitioner's claim. First, it argues that there is no reasonable possibility that the jury misinterpreted the erroneous instruction, because it repeatedly had been instructed that the only possible sentences were death and life without parole. In the circumstances, the state argues, it would be a logical impossibility for Petitioner to receive any other sentence. In the same vein, the state notes that the jury did not receive a "life with parole" verdict form.

It is clear from the instructions that the jury was told that it could only *agree* to sentence Petitioner to death or life without parole. But that is not the difficulty here. The question that the jury posed was what would happen if it *could not agree* on either sentence. Special instruction 60, as written, appears to answer that question. To be sure, the answer that it gives is puzzling. But it is not a logical impossibility. Everyone is familiar with the tactic of

forcing a choice between two alternatives by threatening an unpleasant third alternative ("I want to rent *Alladin!*" "But I want to rent *Tarzan!*" "If you kids can't decide in five minutes, we're not renting anything!"). As lawyers, we know that such sentencing coercion was a *legal* impossibility under California law, but these jurors were not lawyers. They logically could have believed that the self-explanatory special instruction 60 meant what it appeared to say: If they could not make up their minds between the two available sentences, "statutes" would require an unpleasant third alternative. To quote Justice Broussard's dissent on this point in the California Supreme Court:

> Thus the jury would be effectively coerced into unanimity if the dissenting jurors could not countenance allowing [Petitioner] the prospect of parole. However illogical [that] interpretation may appear to persons who are familiar with the workings of the law, [it] is a plausible interpretation of the instruction that the court submitted to the jury and, upon the jury's inquiry, directed that the jury follow.

*Morris,* 279 Cal.Rptr. 720, 807 P.2d at 1005.

Next, the state argues that the trial court's instruction that, "[i]n the event there are any delineations or modifications, you are not to take them into considers [sic]. You are only to take the text as read to you as follows," defeats Petitioner's claim. But there were no apparent "delineations or modifications" in special instruction 60. Rather, the written copy of that instruction simply substitutes "with" for "without." The gist of the state's argument is that the jury could not have misinterpreted the *written* instruction, because it was required to follow the *spoken* instruction, which it had heard once in the middle of the trial court's uninterrupted

reading of 13 pages of jury instructions. In the circumstances, it is too much to expect that any juror noticed a three-letter mistake in a single jury instruction, let alone remembered that mistake. After all, neither the trial court nor counsel noticed the mistake. Further, the trial court's spoken instruction actually contained *both* versions of the instruction ("return a verdict fixing the penalty of life in prison *with* the possibility of—*without* the possibility of parole"). It certainly is too much to expect a lay jury to sort out which was a misstatement and which was a correct statement—especially in the absence of a clear explanation from the trial court.

Also unpersuasive is the argument that, because the jury asked for only a general explanation of special instruction 60, there is no way to be sure what the jury was confused about. Although it is theoretically possible that something else about the instruction confused the jury, the overwhelming likelihood is that it was confused by the typographical error, which contradicted several other sentencing instructions. Further, the fact that the jury asked about the instruction *in connection with* its question about the appropriate penalty in the event of a deadlock makes it even more likely that the jury was focused on the "without parole/with parole" discrepancy.

Finally, the state argues that the question of constitutional error is answered by the Supreme Court's decision in *Jones v. United States,* 527 U.S. 373, 119 S.Ct. 2090, 144 L.Ed.2d 370 (1999). In *Jones,* the Supreme Court rejected the direct appeal of a prisoner condemned under the Federal Death Penalty Act. As in this case, the petitioner in *Jones* argued that the penalty-phase jury instructions might have misled the jury into believing that, if it could not choose between death and life without parole, then the court would im-

pose a lesser sentence. Reviewing for plain error (because the petitioner had not challenged the instructions at trial), the Supreme Court rejected the argument, concluding that there was no plain error. *See id.* at 390–91, 119 S.Ct. 2090.

*Jones* is not controlling because, in that case, there was no indication that the jury actually was confused by any of the instructions. The petitioner parsed the instructions and verdict forms and suggested an interpretation of those materials that arguably conflicted with the law, but there was no evidence to suggest that the jury actually interpreted the instructions in that manner or was confused by them in any way. By contrast, here the jury zeroed in on the single mistyped instruction and asked the court to explain it. This jury was confused by the challenged instruction and, as noted, was reasonably likely to have interpreted it incorrectly, in a manner unfavorable to Petitioner.

In sum, the erroneous jury instruction amounted to constitutional error under *Boyde.* Turning to the second step of the inquiry, the error was not harmless under the *Brecht* standard. The jury was deadlocked when it presented its questions to the trial court. The trial court's responses to those questions, while not improper, unfortunately made it more likely that some or all of the jurors would misapply the incorrect instruction. In the circumstances, it is impossible to state confidently that the error did not prejudice Petitioner's substantial rights. "If we are in grave doubt as to whether the error had such an effect, the petitioner is entitled to the writ." *Coleman,* 210 F.3d at 1051. "Because a death sentence is qualitatively different from other forms of punishment, there is a greater need for reliability in determining whether it is appropriate in a particular case." *Id.* at 1049. Here, the error is too obvious, the likelihood of prej-

udice is too great, and the stakes are too high to conclude that the error was harmless.

We therefore reverse the district court's denial of this claim and order the district court to remand the case to state court for a new penalty-phase trial.

## CONCLUSION

For the reasons stated, we affirm the trial court's grant of summary judgment against Petitioner on the guilt-phase issues in claims 1, 2, 14, and 24 as to which we previously granted a COA; we reverse the grant of summary judgment on the penalty-phase issue of special instruction 60 as presented in claims 36 and 40; and remand the case for further proceedings consistent with this opinion and our previous opinion, which proceedings shall at a minimum include a remand to state court for a second penalty-phase trial.

Writ GRANTED in case No. 01–71622.

In case No. 99–99028, AFFIRMED in part; REVERSED in part; and REMANDED.

FERGUSON, Circuit Judge, concurring:

I concur. However, I question whether defendant's counsel was constitutionally competent at the guilt and penalty phases of the trial. The state trial judge's statements regarding the number of death penalty reversals issued by the California Supreme Court under then Chief Justice Rose Bird were improper, especially considering that three Justices of the Court had been recently recalled due to their decisions on death penalty cases. There is no question that the state trial judge made a drastic error by injecting politics and speculation into a capital case.

However, the defendant has not contended in his federal habeas corpus petition that trial counsel was incompetent by failing to move for a mistrial and demand a new jury not prejudiced by the political statements of the judge. If there was such an allegation, I would have argued that counsel was constitutionally deficient and applied the rule of *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), to both phases of the trial—guilt and penalty.

Nevertheless, because there has been no such contention made before us nor the district court, I am procedurally barred. In death penalty cases, we should not be prohibited from deciding an issue presented in the record and not be limited by the inability of counsel.