**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

MICHAEL ROBERT PULIDO,
  *Petitioner-Appellee,*

  v.

CHRIS CHRONES, Warden,
  *Respondent-Appellant.*

No. 05-15916

D.C. No.
CV-99-04933-CW

MICHAEL ROBERT PULIDO,
  *Petitioner-Appellant,*

  v.

CHRIS CHRONES, Warden,
  *Respondent-Appellee.*

No. 05-16308

D.C. No.
CV-99-04933-CW

OPINION

Appeal from the United States District Court
for the Northern District of California
Claudia Wilken, District Judge, Presiding

Argued and Submitted
June 13, 2006
Submission withdrawn August 1, 2006
Resubmitted May 30, 2007
San Francisco, California

Filed May 30, 2007

Before: Alfred T. Goodwin, Diarmuid F. O'Scannlain, and
Sidney R. Thomas, Circuit Judges.

Per Curiam Opinion;
Concurrence by Judge O'Scannlain;
Concurrence by Judge Thomas

6505

## COUNSEL

Jeremy Friedlander, Deputy Attorney General, San Francisco, California, argued the cause for the respondent-appellant. Bill Lockyer, Attorney General of the State of California; Robert R. Anderson, Chief Assistant Attorney General; Gerald A. Engler, Senior Assistant Attorney General; and Peggy S. Ruffra, Supervising Deputy Attorney General were on the briefs.

J. Bradley O'Connell, San Francisco, California, argued the cause for the petitioner-appellee and was on the brief.

## **OPINION**

PER CURIAM:

We must consider whether a state court erred in affirming a conviction for murder.

I

Michael Pulido was tried and convicted for his role in the robbery of a Shell gasoline station in San Mateo, California and the murder of an employee. He claims that the California Supreme Court wrongly affirmed his conviction.

A

Because Pulido's claims are fact-intensive, we consider the facts—as presented by the California Supreme Court in its opinion affirming Pulido's conviction—in some detail:

> Sometime between 1 a.m. and 5:30 a.m. on May 24, 1992, Ramon Flores, the cashier at a Shell gas station in San Mateo, was shot in the head with a single .45-caliber bullet, killing him within seconds. A neighbor heard a loud bang coming from the direction of the gas station around 3:45 a.m., then a voice yelling; he could not distinguish words, but told a police detective it sounded like the person was addressing someone else. A cash register taken from the store was found the next morning in some roadside bushes elsewhere in San Mateo. Defendant's fingerprints were on the cash register, as well as on an unopened can of Coke found on the store counter. No fingerprints of Michael Aragon, who defendant testified committed the killing, were identified on either the can or the register.

> Arrested on an unrelated auto theft charge, defendant volunteered that he had information about the

Shell station robbery. He led police to a location where they found discarded, unused .45-caliber cartridges, which bore ejection markings resembling those on a cartridge found on the gas station floor. Defendant made a series of inconsistent exculpatory statements to police, blaming the robbery and killing successively on a man named Carlos Vasquez, on a relative of defendant's named Eduardo Alarcon and, finally, on an unidentified Tongan man. In a telephone conversation from jail with his uncle, Michael Aragon, and Aragon's cohabitant, Laura Moore, however, defendant said he was alone during the robbery.

At the time of the killing, defendant was staying with Aragon, Moore and their children in their San Mateo home. While he was staying with them, Aragon, two of the children, and a neighbor saw defendant with a pistol, which the neighbor identified as a .45-caliber Colt. During that time, defendant twice observed that the nearby Shell station would be easy to rob because the attendant was always asleep. Aragon told defendant to get rid of the gun because he, Aragon, was on probation. He had been convicted in 1989 of burglary, possession of cocaine and contributing to the delinquency of a minor.

Aragon and Moore testified that defendant was at home when they went to bed around midnight on May 23, but was gone when they got up at around 3 a.m. to care for their baby. The next morning, Sunday, May 24, they awoke to find defendant asleep in the living room with his clothes and shoes on. He showed Aragon his wallet and said, "Look unc, almost all ones." Later that day, Moore discovered defendant was carrying a handgun and insisted he and Aragon dispose of it. At her direction, defendant took the gun apart; Moore then boiled the pieces in

soapy water and put most of them in a bag, which defendant and Aragon threw away near Candlestick Park. Two pieces that Moore had retained to prevent reassembly were later given to police and identified as fitting a .45-caliber Colt.

After seeing a newspaper article about the killing, Aragon asked defendant if he committed it. Defendant denied he had, but a few days later, when Aragon asked again, defendant admitted the crime. He told Aragon he bought a Coke, then shot Flores in the face, took the register and later threw it in some bushes. In a letter from jail, however, defendant wrote to Moore, "If Michael is reading this, tell him I didn't kill that guy, I was just messing with him."

Defendant testified, blaming Aragon for the killing. Aragon, he stated, had seen where defendant kept the pistol. On the night of May 23, defendant and Aragon went out in Aragon's car; defendant thought the pistol was on the shelf where he usually kept it. They went to Hunters Point, where Aragon bought and smoked some cocaine. They left, but returned later for Aragon to buy and smoke more cocaine. Eventually the two arrived at the Shell station in San Mateo. Aragon went inside, defendant thought for matches or cigarettes. Defendant waited outside. He heard a gunshot and ran into the store. Aragon was holding defendant's gun. Flores was lying on the floor, bleeding from a large bullet wound in his face. Defendant yelled at his uncle, ran out of the store and got in the passenger seat of the car. A few seconds later, Aragon came out, holding the cash register in his left hand and the gun in his right hand. He threw the register on defendant's lap and drove away.

As they were driving away from the scene, Aragon told defendant to open the register. When defen-

dant did not comply, Aragon pointed the gun at him and insisted. Defendant got a screwdriver from the back of the car and pried the register open. At Aragon's command defendant gave him the money and dumped the register in some bushes by the side of the road. Defendant denied touching a Coke can in the store that night; he suggested he might have touched the can on some earlier occasion when he bought a drink at the store.

The defense also presented evidence casting doubt on Aragon's credibility. While admitting a prior drug possession conviction, Aragon denied he was still using cocaine at the time of the killing. However, Aragon's sister (defendant's aunt) testified he came to her house on Sunday, May 24 or Monday, May 25, at which time he was "on something," but did not smell of alcohol. Her son described Aragon as acting paranoid and smelling of crack cocaine. The sister opined Aragon was a liar and a thief. A police detective testified that, when first interviewed, Aragon said he had gotten up at 12:15 a.m. Sunday to take care of the baby. When Aragon and Moore were later interviewed together at the police station, both said it was around 3 a.m. During a discussion about the time period in which the killing occurred, Aragon said to Moore, "That's when I was with you, remember?"

*People v. Pulido*, 936 P.2d 1235, 1237-38 (Cal. 1997).

B

On July 2, 1993, a jury convicted Pulido of first degree murder, robbery, receiving stolen property, and auto theft. The jury also returned a special circumstance finding of robbery felony-murder, under Cal. Penal Code § 190.2(a)(17)(I). The jurors deadlocked on allegations that Pulido personally

used a firearm and personally inflicted great bodily injury as defined by Cal. Pen. Code §§ 12022.5(a), 1203.075. Thus, we will assume for the purposes of our analysis that Pulido did not personally murder Flores.

The trial court sentenced Pulido to life without the possibility of parole for murder with special circumstances. *See* Cal. Pen. Code § 190.5(b). The California Court of Appeal affirmed the murder conviction, *People v. Pulido*, 52 Cal. Rptr. 2d 373 (Ct. App. 1996), as did the California Supreme Court, *Pulido*, 936 P.2d 1235.

After filing various habeas petitions in the California superior court and California Court of Appeal, Pulido filed a pro se habeas petition with the California Supreme Court, which that court summarily denied on July 28, 1999. Pulido then filed the present petition in the federal district court on November 16, 1999. The district court granted Pulido's petition on the grounds of prejudicial instructional error. The district court rejected Pulido's remaining claims, but granted a partial certificate of appealability ("COA") on four of these.

The State of California timely appealed the grant of the petition, and Pulido timely cross-appealed the denial of his petition on the four remaining grounds.[1]

II

Pulido asserts that the trial court's erroneous jury instructions constituted prejudicial constitutional error and that the state court decision affirming his conviction was both contrary to and an unreasonable application of clearly established federal law.[2] More specifically, Pulido claims that because of

---

[1]In a concurrently filed memorandum disposition, we affirm the district court's denial of Pulido's petition as to these issues. *See Pulido v. Chrones*, Nos. 05-15916 & 05-16308 (**filed May 30, 2007**)."

[2]Because Pulido filed his habeas petition after April 24, 1996, the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") gov-

multiple instructional errors, the jury could have convicted him of felony-murder under an invalid legal theory: felony-murder solely on the basis of post-murder involvement in the robbery, for there was no contemporaneity finding linking Pulido to *pre*-murder involvement in the robbery.[3] The State

---

erns this case. The district court's decision to grant or to deny a habeas petition is reviewed de novo. *Benn v. Lambert*, 283 F.3d 1040, 1051 (9th Cir. 2002).

AEDPA limits habeas relief to situations in which the state court's decision was "contrary to, or involved an unreasonable application of, clearly established federal law as determined by the Supreme Court." 28 U.S.C. § 2254(d)(1); *see Williams v. Taylor*, 529 U.S. 362, 407-09 (2000). The burden of proof rests with the petitioner, *see Woodford v. Visciotti*, 537 U.S. 19, 24 (2002) (per curiam), and for each claim, we analyze the last-reasoned state court opinion, *see Ylst v. Nunnemaker*, 501 U.S. 797, 803 (1991).

A state court decision is "contrary to" clearly established federal law if it arrives at a conclusion opposite to that reached by the Supreme Court on a question of law. *See Williams*, 529 U.S. at 405-06. The state court would also render a decision contrary to "clearly established Federal law" if it "confront[ed] a set of facts that are materially indistinguishable from a decision of [the Supreme] Court and nevertheless arrive[d] at a result different from [its] precedent." *Id.* at 406.

A state court's decision involves an "unreasonable application" of federal law if it (1) "correctly identifies the governing rule but then applies it to a new set of facts in a way that is objectively unreasonable," or (2) "extends or fails to extend a clearly established legal principle to a new context in a way that is objectively unreasonable." *Hernandez v. Small*, 282 F.3d 1132, 1142 (9th Cir. 2002). To warrant habeas relief, "[t]he state court's application of clearly established law must be objectively unreasonable," not merely incorrect. *Lockyer v. Andrade*, 538 U.S. 63, 75-76 (2003) (citing *Williams*, 529 U.S. at 409, 411). Even the federal court's "firm conviction" that the decision was "erroneous" is an insufficient basis on which to grant relief. *Id.* at 75 (citation omitted).

[3]In evaluating an allegedly erroneous jury instruction, we first determine whether the error, if any, amounted to constitutional error. *See Morris v. Woodford*, 273 F.3d 826, 833 (9th Cir. 2001). If there is constitutional error, we consider whether the error was harmless; that is, whether the error had a " 'substantial and injurious effect or influence in determining the jury's verdict.' " *Id.* (quoting *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993)).

responds that the California courts reasonably affirmed the verdict because the jury's special circumstance finding incorporated a contemporaneity finding.

A

The jury instructions in this case covered murder (California Jury Instructions, Criminal ("CALJIC") 8.21), aiding and abetting, (CALJIC 8.27 and CALJIC 9.40.1), robbery-murder special circumstances (CALJIC 8.80.1, CALJIC 8.81.17, CALJIC 8.83, and CALJIC 8.83.1), robbery (CALJIC 9.40), and felony-murder (CALJIC 9.44, CALJIC 3.00, and CALJIC 3.01). The State concedes that two of these instructions were defective.

[1] First, the felony-murder instructions were defective because, in *Pulido*, the California Supreme Court held that aiding and abetting a robbery *after* the killing of a victim does not constitute felony-murder under California law. *See* 936 P.2d at 1238-43; *id.* at 1243 (refusing to extend the "felony-murder rule to include aiders and abettors or conspirators who join the felonious enterprise only after the murder has been completed."). Because the felony-murder instructions presented to the jury allowed conviction on the basis of after-the-murder robbery involvement, the felony-murder instructions are invalid and are insufficient to support the conviction, which requires a finding of contemporaneity under California criminal law. *See id.* at 1243-44.

[2] Second, the State concedes that one of the murder-robbery special circumstance instructions was invalid. The district court discovered a typographic error: the jury instructions substituted "or" for "and" in CALJIC 8.81.17, erroneously enlarging the scope of activity that would qualify as murder-robbery under the special circumstance.[4]

---

[4]CALJIC 8.81.17, as delivered to the jury, reads:

## B

The California Supreme Court concluded that any instructional error was harmless because the special circumstance verdict required the jury to make the necessary contemporaneity determination:

> [D]efendant cannot demonstrate prejudice from the asserted instructional error: "[T]he factual question posed by the omitted instruction was necessarily resolved adversely to defendant under other, properly given instructions." (*People v. Sedeno*, [518 P.2d 913, 924 (Cal. 1974)]) Specifically, the jury was instructed that the robbery-murder special-circumstance allegation could not be found true unless defendant was engaged in the robbery *at the time of the killing*. In a modified form of No. 8.80.1 . . . the jury was directed to determine whether or not "the murder was committed *while the defendant was engaged or was an accomplice in*" robbery, attempted robbery or the immediate flight from a robbery. (Italics added.) In the special circumstance verdict, consistent with this instruction, the jury

---

To find that the special circumstance, referred to in these instructions as murder in the commission of robbery is true, it must be proved:

1. The murder was committed while the defendant was engaged in the commission or attempted commission or a robbery; ***or***

2. The murder was committed in order to carry out or advance the commission of the crime of robbery or to facilitate the escape therefrom or to avoid detection. In other words, the special circumstance referred to in these instructions is not established if the robbery was merely incidental to the commission of the murder.

(emphasis added to show typographical error; the "or" should read "and").

found "that the said defendant, Michael Robert Pulido, engaged in or was an accomplice in the commission of or attempted commission of robbery *during the commission of crime charged in count 1* [murder]." (italics added.) By its special circumstance verdict the jury thus found—explicitly, unanimously and necessarily—that defendant's involvement in the robbery, whether as direct perpetrator or as aider and abettor, commenced before or during the killing of Flores.

Defendant argues the special circumstance finding is not dispositive because, under another portion of CALJIC No. 8.80.1, the jury could have based its finding on defendant's being a "major participant" in the robbery and acting with "reckless indifference to human life." Such a finding, defendant asserts, could in turn have rested on defendant's assisting Aragon after the killing instead of seeking help for Flores. We disagree. Postkilling assistance to Aragon, by itself, could not have been the basis for the jury's explicit finding defendant "engaged in or was an accomplice in the commission of or attempted commission of robbery *during* the commission of [murder]," nor could it have satisfied the instructional requirement that "the murder was committed *while* the defendant was engaged or was an accomplice in" robbery. (Italics added.) The special circumstance finding thus demonstrates the jury did not accept the theory defendant joined the robbery only after Flores was killed. Any error in the failure specially to instruct on this issue was harmless.

For the same reason, no prejudice could have arisen from the instructions actually given on duration of robbery and liability of accomplices for first degree felony murder. Defendant contends these instructions permitted the jury to convict him of

murder on the legally inadequate ground that he assisted Aragon in taking away the robbery loot. An instructional error presenting the jury with a legally invalid theory of guilt does not require reversal, however, if other parts of the verdict demonstrate that the jury necessarily found the defendant guilty on a proper theory. (*People v. Guiton*, [847 P.2d 45, 53 (Cal. 1997)].) As shown above, the jury's true finding on the robbery-murder special circumstance so demonstrates.

*Pulido*, 936 P.2d at 1243-44 (emphasis in state court opinion).

As the foregoing discussion demonstrates, however, and as the State now concedes, the special circumstance instruction erroneously used the word "or" rather than "and" in joining the contemporaneity prong to the "committed in order to carry out or advance the commission of the crime" prong. Paradoxical though it may seem, the erroneous explanation in CALJIC 8.81.17 permitted the jury to find the special circumstance that the murder was committed "while the defendant was engaged in or was an accomplice in" robbery without in fact finding that the acts were contemporaneous. This is so because the jury was instructed that if it merely found that the murder was committed "in order to carry out or advance" the robbery, it should find that the special circumstance was satisfied. Nowhere was this erroneous description of the requirements for finding the special circumstance corrected. Thus, the California Supreme Court's conclusion that the jury "necessarily" found the defendant guilty on a proper theory does not follow.

C

**[3]** Pulido urges, and the district court agreed, that the California Supreme Court decision was contrary to federal law because it improperly applied harmless error analysis. In particular, Pulido contends that under our court's recent decision

in *Lara v. Ryan*, 455 F.3d 1080 (9th Cir. 2006) (decided subsequent to the district court proceedings in this case), the instructional error was structural and therefore not subject to harmless error review. In *Lara*, the defendant was convicted of attempted murder after the jury had been instructed that it could convict him under a theory of express malice or an implied malice theory, the second of which was legally improper. 455 F.3d at 1082. Relying primarily on the Supreme Court's decision in *Sandstrom v. Montana*, 442 U.S. 510 (1979), and this court's decision in *Keating v. Hood*, 191 F.3d 1053 (9th Cir. 1999), we held that such error was structural and that "where a reviewing court cannot determine with absolute certainty whether a defendant was convicted under an erroneous theory" reversal is required. *Lara*, 455 F.3d at 1086. We concluded that because the jury had made a specific finding that Lara had attempted to murder willfully, deliberately, and with premeditation it was absolutely certain that the jury had not convicted on the improper implied-malice theory.

**[4]** Here, the jury instructions leave open the possibility that the jury convicted Pulido on a legally impermissible theory, namely, that the defendant joined the robbery only after Flores was killed. The typographical error in the contemporaneity instruction relied upon by the California Supreme Court introduces doubt into any inference to be drawn from the jury's finding as to the special circumstance. Because, unlike in *Lara*, we cannot be "absolutely certain" that the jury found that Pulido's crime of robbery was committed contemporaneously with the murder, the verdict must be reversed.

### D

Because Pulido's conviction must be reversed under *Lara*'s absolute certainty standard, we need not consider his alternative claims for relief.

### III

For the foregoing reasons, the decision of the district court is AFFIRMED.

O'SCANNLAIN, Circuit Judge, concurring specially:

I agree with the majority that our recent decision in *Lara v. Ryan*, 455 F.3d 1080 (9th Cir. 2006), compels us to affirm the district court's grant of habeas relief. I write separately, however, because I believe this circuit's instructional error jurisprudence cries out for review, preferably by our court sitting en banc, or if not, by the Supreme Court.

I

In *Lara*, we rejected the state's argument that instructional errors of the sort at stake in this case (involving the possibility of conviction on legally impermissible grounds) should be reviewed for harmless error under the standard set forth in *Chapman v. California*, 386 U.S. 18 (1967). *Lara*, 455 F.3d at 1086. *Chapman* stands for the principle that a federal constitutional error may be held harmless if a court is "able to declare a belief that it was harmless beyond a reasonable doubt." *Chapman*, 386 U.S. at 24. Instead, purportedly relying on *Sandstrom v. Montana*, 442 U.S. 510 (1979), we held in *Lara* that because the error at stake "enabled the jury to deliver a general verdict that potentially rested on different *theories of guilt*, at least one of which was constitutionally invalid," the error must have been "structural" and not subject to harmless error review. *Lara*, 455 F.3d at 1086.

It is true that *Sandstrom* held that a state trial court committed federal constitutional error by instructing a jury with a rebuttable, burden-shifting presumption on an element of the offense, even though it was not certain that the jury had relied upon the burden-shifting instruction at issue. *Sandstrom*, 442 U.S. at 526. The Supreme Court in *Sandstrom* went on to cite a much earlier case, *Stromberg v. California*, 283 U.S. 359, to the effect that where a case is submitted to the jury on alternative theories, the unconstitutionality of one of the theories requires that the verdict be set aside. *Sandstrom*, 442 U.S. at 526. But *Lara*'s reliance on *Sandstrom* as leading to the rejec-

tion of harmless error review for *Sandstrom* errors is dubious at best, inasmuch as *Sandstrom* itself specifically reserved judgment on that very question, however decisive its citation of *Stromberg* may seem. *Sandstrom*, 442 U.S. at 526-27.[1] Moreover, the distinction between structural errors and trial errors relied upon in *Lara* is patently illogical.

*Lara* rightly recognizes that we review instructions that omitted elements of offenses for harmless error. *Lara*, 455 F.3d at 1086. *Lara* describes such trial errors as "simply" omitting or "merely" omitting elements from instructions, and contrasts them with the allegedly more serious error of placing before the jury one correct and one incorrect instruction. *Id.* But these uses of "simply" and "merely" represent nothing more than rhetorical legerdemain: for the result of element-omitting instructions is of course that the *only* theory placed before the jury is constitutionally defective. And yet, as we recognized in *Lara*, such errors are subject to harmless error review. Thus, we implicitly decided in *Lara* that a jury instruction adding a legally permissible theory to a legally impermissible one somehow *increases* the gravity of the error.

If logic is not enough to demonstrate our mistake in *Lara*, then Supreme Court text ought to be. In *Rose v. Clark*, 478 U.S. 570 (1986), the Court clearly indicated its answer to the question it had held in abeyance in *Sandstrom*, whether harmless error review is properly applied to *Sandstrom* errors:

> We agree that the determination of guilt or inno-
> cence . . . is for the jury rather than the court. . . .

---

[1]In fairness, *Lara* claims also to be relying upon this court's elaborations of the *Sandstrom* opinion, especially our decision in *Keating v. Hood*, 191 F.3d 1053 (9th Cir. 1999). *Lara*, 455 F.3d at 1086. Indeed, *Keating* is quoted for the "absolute certainty" standard applied in *Lara*. *Id.* at 1085. Nevertheless, as will be shown below, citations to our own confused circuit law in this area cannot overcome the Supreme Court's own clear rejection of the structural error analysis adopted in *Lara*.

Harmless-error analysis addresses a different question: what is to be done about a trial error that, in theory, may have altered the basis on which the jury decided the case, but in practice clearly had no effect on the outcome? This question applies not merely to *Sandstrom* violations, but to other errors that may have affected either the instructions the jury heard or the record it considered—including errors such as mistaken admission of evidence, or unconstitutional comment on a defendant's silence, or erroneous limitation of defendant's cross-examination of a prosecution witness. All of these errors alter the terms under which the jury considered the defendant's guilt or innocence, and therefore all theoretically impair the defendant's interest in having a jury decide his case. The dissent's argument—that the Sixth Amendment forbids a reviewing court to decide the impact of a trial error on the outcome . . . logically implies that all such errors are immune from harmless error analysis. Yet this court has repeatedly held to the contrary . . . . Indeed, *Chapman*, the beginning of this line of cases, applied harmless-error analysis to an error that placed an improper argument before the jury . . . . These decisions, ignored by the dissent, strongly support the application of harmless-error analysis in the context of *Sandstrom* error.

*Rose*, 478 U.S. at 58, n.11 (citations omitted). Even though *Rose* did not squarely address the precise error at stake here and in *Lara*, the logic of the opinion, as demonstrated by the passage quoted, is unmistakable.

For this reason, shortly after *Rose*, the First Circuit rejected the same logic we embraced more than twenty years later in *Lara*:

Once the camouflage is stripped away, petitioner's assertion reduces to the strange claim that, because

the jury here received both a "good" charge and a "bad" charge on the issue, the error was somehow more pernicious than in *Rose*—where the *only* charge on the critical issue was a mistaken one. That assertion cannot possibly be right, so it is plainly wrong.

*Quigley v. Vose*, 834 F.2d 14, 16 (1st Cir. 1987) (per curiam). Our decision in *Lara* fails to note either *Rose* or *Quigley*, let alone to distinguish them.

## II

As the foregoing discussion makes clear, *Lara*'s attempt to distinguish instructional errors involving impermissible alternative theories from any other instructional errors is logically unsustainable and inconsistent with Supreme Court precedent. Our reliance upon signaling words such as "merely" and "simply" to describe serious constitutional errors such as those at stake in *Chapman* serves, indeed, only to camouflage the underlying reality and to create a distinction where there is no difference—as if by playing with names, the scent of *Rose* might be altered. I believe that *Lara* should be overruled to correct our erroneous instructional error jurisprudence—if not by our court sitting en banc then, in due course, by the Supreme Court. Until that happens, I have no alternative but to concur in the opinion of the court.

---

THOMAS, Circuit Judge, concurring:

Although I agree with the majority opinion that *Lara v. Ryan*, 455 F.3d 1080 (9th Cir. 2006), requires us to treat the instructional error at issue here as a structural error, I write separately to emphasize that the result the majority reaches would be the right result even under a harmless error standard. I also write to express my respectful disagreement with

the conclusion of my concurring colleague that *Lara* should be overruled.

I

Under the harmless error standard, the government bears the burden of demonstrating that the alleged error could not have affected the outcome. *Chapman v. California*, 386 U.S. 18, 23-24 (1967). Specifically, the government must show that it is "clear beyond a reasonable doubt that a rational jury would have found the defendant guilty absent the error." *Neder v. United States*, 527 U.S. 1, 18 (1999).

When applying the harmless error standard in a case of instructional error, the court must evaluate the record as a whole. *Id.* at 19 ("Of course, safeguarding the jury guarantee will often require that a reviewing court conduct a thorough examination of the record."). Although it might be possible to conclude that an individual verdict form was sufficiently clear to cure an instructional error, the relevant question must not be so limited. Rather, the court must determine whether the entire record, including not just curative instructions but all aspects of the jury's deliberative process, undoubtedly demonstrates that a rational jury would have convicted the defendant even if the error had not been made. In other words, as the Supreme Court has specifically held, "a single instruction to the jury may not be judged in artificial isolation but must be viewed in the context of the overall charge." *Middleton v. McNeil*, 541 U.S. 433, 437 (2004) (quoting *Boyde v. California*, 494 U.S. 370, 378 (1990)).

II

The government offers two theories for finding that the instructional error was harmless — or at least for finding that the California Supreme Court did not unreasonably apply *Chapman v. California*, 386 U.S. 18 (1967), when it concluded that the error was harmless.

First, the government points out that one of the three special circumstance robbery-murder instructions, CALJIC 8.80.1, required the jury to find that "the murder was committed *while* the defendant was engaged in or was an accomplice in . . . robbery." The state Supreme Court concluded and the government now contends that that instruction sufficiently cured any confusion arising from the flawed felony-murder instruction and from the typographical error in CALJIC 8.81.17 because it clearly required contemporaneity between the murder and the defendant's involvement in the robbery.

Second, the government points out that the jury's verdict form for special circumstance robbery-murder specified that Pulido "engaged in or was an accomplice in the commission of or attempted commission of robbery *during the commission* of the crime charged in Count 1 [murder]." According to both the California Supreme Court and the government, that language on the verdict form demonstrates that the jury found "explicitly, unanimously and necessarily[ ] that defendant's involvement in the robbery . . . commenced before or during the killing of Flores." *People v. Pulido*, 936 P.2d 1235, 1243-44 (Cal. 1997).

As should be apparent, both of the government's theories rely on isolated documents; in fact, both theories rely on isolated quotations found within isolated documents. The government argues that those isolated quotations sufficiently demonstrate the jury's understanding of and reliance on contemporaneity. But the government's and the California Supreme Court's analysis of isolated documents, as noted in the first part of this opinion, does not suffice under *Chapman* and *Neder* to prove harmlessness beyond a reasonable doubt. Instead, the California Supreme Court and this court are required to review the entire record to determine whether the error caused harm. Our conclusion cannot rest on a verdict form and an allegedly curative instruction taken in isolation; it must include a careful review of the entire record to determine whether the government's interpretation of isolated doc-

uments is consistent with other evidence of the jury's probable and actual thinking.

## III

Once the entire record is considered in this case, it becomes apparent that the supposedly curative instruction actually aggravated, rather than curing, the instructional error. Furthermore, the entire record reveals that the multiple instructional errors at issue in this case had great potential to — and did in fact — cause jury confusion. As a result, one cannot conclude beyond a reasonable doubt that the flawed instructions were irrelevant to the outcome.

## A

First, the portion of CALJIC 8.80.1 that supposedly cured the errors is an extremely small portion of that instruction; the instruction as a whole, particularly when read together with other instructions given, actually aggravates the errors in the felony-murder instructions and the special circumstance instruction, CALJIC 8.81.17.

The allegedly curative language is contained solely in the legal formulation of the special circumstance, which states that the special circumstance is true if "the murder was committed *while* the defendant was engaged in or was an accomplice to . . . robbery." The same instruction, however, later clarifies the standards for finding the special circumstance under various factual scenarios. Most importantly for purposes of this case, the instruction provides special standards for cases in which the "defendant was not the actual killer of a human being" or in which the jury is "unable to decide whether the defendant was the actual killer[.]" CALJIC 8.80.1, at 2. That is, the instruction lays out special guidelines for convicting a non-triggerman of the special circumstance.

Because the jury hung on the question of whether Pulido used a gun, we must assume that the jury's special circum-

stance finding relied on those specific standards for non-triggermen. In other words, because we know that the jury could not decide whether Pulido was the triggerman and because we must assume that the jury followed all instructions, we must also assume that the jury followed the special circumstance guidelines that apply when a jury is "unable to decide whether the defendant was the actual killer."

In turn, those standards advise the jury that non-triggermen are ineligible for the special circumstance "unless you [the jury] are satisfied beyond a reasonable doubt that the defendant with the intent to kill aided, abetted, counseled, commanded, induced, solicited, requested, or assisted any actor in the commission of the murder in the first degree, or with reckless indifference to human life and as a major participant, aided, abetted, counseled, commanded, induced, solicited, requested, or assisted in the commission of the crime of robbery . . . which resulted in the death of a human being." *Id.* The instruction, thus, specifically instructed the jury to find the special circumstance in this case if it concluded *either* that Pulido, with intent to kill, aided and abetted the murder *or* that Pulido, with reckless indifference to life, aided and abetted *the robbery*. As should be clear, those standards allow the jury to find the special circumstance based solely on the theory that Pulido aided and abetted the robbery with reckless indifference to human life.

Once we consider that instruction in the context of the entire record, it becomes apparent that the jury might have found the special circumstance — might have found aiding and abetting with reckless indifference — based solely on Pulido's proffered factual theory that he knowingly participated in the crime only after the theft and the murder were completed. There are two aspects of the cumulative jury instructions that make this possibility viable. First, the court specifically instructed the jury that aider and abettor liability for robbery "continues so long as the stolen property is being carried away to a place of temporary safety." CALJIC 9.40.1

(1991 New). The court did *not* instruct the jury that this definition of aider and abettor liability attached only to the robbery count — that the relevant assistance for *felony-murder* purposes must begin before or during the robbery and murder. The jury therefore might reasonably but erroneously have believed that Pulido aided and abetted the robbery within the meaning of the robbery-murder instruction, CALJIC 8.80.1, even if, as Pulido maintained, his participation began *after* the robbery and the shooting. Because aiding and abetting the robbery (with reckless indifference to life) sufficed to find the special circumstance under the non-triggerman guidelines and because after-the-fact participation sufficed to find aider and abettor liability under the robbery instructions, the jury might erroneously have found the special circumstance to be true even under Pulido's proffered facts.

The second troubling aspect of the cumulative instructions is that they nowhere define "reckless indifference to human life." Although there was no evidence introduced at trial that would have supported a *legal* conclusion of reckless indifference, it seems extremely unlikely that — without instruction — the jury took a limited, legalistic view of the "reckless indifference" language. Under its ordinary meaning, "reckless indifference to human life" might very well encompass the act of assisting someone to flee the scene of a murder. In other words, a lay jury might have concluded that Pulido was recklessly indifferent to the victim's life even if it concluded that the victim was already dead before Pulido participated in the robbery.

Taking the cumulative instructions, the jury might have concluded that Pulido's after-the-fact assistance met both qualifications for non-triggerman liability under the special circumstance. Pulido was an aider and abettor within the meaning of CALJIC 9.40.1, and he acted with reckless indifference to the victim's life within the lay meaning of those words.

Given these two characteristics of the cumulative jury instructions — that the jury was specifically instructed to find Pulido guilty of aiding and abetting even if he became involved only after the robbery was completed and that the jury was never given a legal definition of "reckless indifference to human life" — it seems at least possible that the jury erroneously found the special circumstance to apply to post-murder involvement, even if it relied wholly on the supposedly curative CALJIC 8.80.1. The specific standards for non-triggerman liability in CALJIC 8.80.1, which could encompass post-murder involvement, severely undermine the government's and the California Supreme Court's single-minded reliance on the instruction's legal formulation of the special circumstance. Reading the entirety of CALJIC 8.80.1 and taking it together with all other relevant instructions, the jury was essentially instructed as follows: "You may find it to be true that the murder was committed *while* the defendant was aiding and abetting robbery if you find (1) that the defendant began assisting a robber after the theft was complete and (2) that he did so with a reckless indifference to human life." When stated succinctly and then applied to this case, the combined instructions are, undoubtedly, internally inconsistent. In a case in which the theft and murder occurred simultaneously, it should not be possible to conclude that the murder was committed *while* defendant was assisting a robbery if one concludes that the defendant did not start assisting the robbery until after the theft was committed. Nevertheless, the combined instructions nowhere precluded that illogical conclusion and impliedly allowed it. Without clarifying instructions from the court, it seems entirely possible that the jury simply accepted the internal inconsistency of their finding as a legal fiction, assuming that the legal formulation of the special circumstance was less important to its conclusion than the extensive standards it was given for determining whether the special circumstance applied to a non-triggerman like Pulido. At the very least, the cumulative instructions give rise to reasonable doubt as to the jury's thinking; it is not clear beyond all doubt that the jury relied on the minimal contemporaneity

language contained in the legal formulation of the special circumstance.

For the same reasons, the California Supreme Court's and the government's reliance on the verdict form does not suffice to remove all reasonable doubts as to the jury's thinking. While the verdict form specified that the special circumstance applies only if Pulido aided robbery "*during the commission* of the [murder]," the standards that the jury was given for determining whether it could issue that verdict allowed it to do so based on post-murder involvement. Given the combination of instructions that the jury received, it seems possible that at least some jurors simply accepted that the verdict form did not mean what it said. Again, in light of the various instructions that allowed after-the-fact involvement to count (including not only the allegedly curative CALJIC 8.80.1 *but also* the admittedly defective CALJIC 8.81.17), the jury may have assumed that the contemporaneity language on the verdict form was simply a legal fiction.

In conclusion, neither the supposedly curative instruction nor the verdict form removes all reasonable doubts as to the jury's thought process. In fact, when read together with all jury instructions, the supposedly curative instruction compounds rather than alleviating the possibility that the jury found a special circumstance of robbery-murder even while accepting Pulido's theory of after-the-fact assistance.

B

This theoretical possibility becomes more realistic in light of the questions that the jury submitted to the judge during its deliberations. The Supreme Court has held that questions from the jury can demonstrate that the trial court has failed adequately to instruct the jury. *See, e.g., Shafer v. South Carolina*, 532 U.S. 36, 52-53 (2001); *Simmons v. South Carolina*, 512 U.S. 154, 178 (1994); *Bollenbach v. United States*, 326 U.S. 607, 612 (1946). In this case, three jury questions reveal

that the jurors were struggling with the requirements of aider and abettor liability, felony-murder, and the special circumstance robbery-murder. First, the jury asked for "instructions special circumstances for *both* count 1 and count 2" (emphasis original). This question demonstrates a certain degree of confusion given that the special circumstance does not attach to either count but, rather, intends to be a special finding of contemporaneity between the two counts. Second, the jury asked whether aider and abettor liability requires "knowledge [of the purpose of the perpetrator] prior to the commission of the crime or during the commission of the crime[.]" This question clearly demonstrates that the jurors were confused as to the timing requirements for aider and abettor liability, unsure whether Pulido could be found guilty on an aider and abettor theory if he became aware of the principal's purpose only during or after commission of the crime.

Third and most importantly, the jurors asked whether they could find felony murder based solely on actual "facilitat[ing] by aiding" or whether they must also find that Pulido intended for the robbery to occur. Like the previous question, this question demonstrates that at least some jurors believed that Pulido developed knowledge and intent only after the actual theft had occurred; otherwise, on the alternative facts presented, there could have been little doubt that Pulido intended to commit robbery. Critically, that question also demonstrates the jurors' belief that Pulido's intent to commit *robbery* would be the determining factor in a felony-murder conviction, not Pulido's intent to commit *murder*. That distinction raises a very real possibility that the jury found the special circumstance under the "reckless indifference" prong rather than the "intentional murder" prong of the standards for non-triggerman liability.

Importantly, the judge did not answer any of those questions directly. Instead, he merely referred the jurors back to their flawed and inconsistent instructions.

Based on these jury questions, it seems not only possible but *probable* that the jurors were confused as to the timing and intent requirements in the felony-murder and special circumstance instructions. Those questions, at the very least, raise a reasonable doubt as to whether the jurors understood and relied on the contemporaneity requirement that was formally included in the verdict form and in the legal formulation of the special circumstance.

### C

In conclusion, the government's theories fail to establish beyond a reasonable doubt that the error in this case was harmless. The cumulative instructions allowed a conviction for felony-murder and a finding of special circumstance robbery-murder even under Pulido's asserted factual theory that he became a knowing participant only after the robbery and shooting were completed. Furthermore, the jurors' questions raise a real possibility that at least one juror would have voted to acquit Pulido of felony-murder and special circumstance charges if the jury had been properly instructed that contemporaneity was a necessary finding. Therefore, I conclude that Pulido would be entitled to relief even under a harmless error standard.

### IV

The special concurrence urges us to reexamine *Lara*. I believe *Lara* was correctly decided. *Lara* was founded on *Sandstrom v. Montana*, 442 U.S. 510, 526 (1979), which held that "when a case is submitted to the jury on alternative theories the unconstitutionality of any of the theories requires that the conviction be set aside." *Id.* (citing *Stromberg v. California*, 283 U.S. 359, 368 (1931)). *Sandstrom* was not an anomolous decision. In *Zant v. Stephens*, 462 U.S. 862, 881 (1983), the Supreme Court held that "a general verdict must be set aside if the jury was instructed that it could rely on any of two or more independent grounds, and one of those grounds is

insufficient, because the verdict may have rested exclusively on the insufficient ground." Similarly, in *Yates v. United States*, 354 U.S. 298, 312 (1957), *overruled on other grounds by Burks v. United States*, 437 U.S. 1(1978), the Court stated that:

> [T]he proper rule to be applied is that which requires a verdict to be set aside in cases where the verdict is supportable on one ground, but not on another, and it is impossible to tell which ground the jury selected.

*Id.*

In sum, the conclusion in *Lara* that the Supreme Court meant what it said in *Sandstrom* is firmly founded in Supreme Court jurisprudence. I would not revisit the holding in *Lara*.

V

Because I agree that *Lara* controls this case, because I believe that *Lara* was properly decided, and because Pulido would be entitled to relief even under a harmless error standard, I concur in the majority opinion.