# FOR PUBLICATION

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

JOSHUA RICHTER,
          *Petitioner-Appellant,*

v.

R. Q. HICKMAN, Warden; CAL A.
TERHUNE; ERNIE ROE,
          *Respondents-Appellees.*

No. 06-15614

D.C. No.
CV-01-00643-JKS

CHRISTIAN BRANSCOMBE,
          *Petitioner-Appellant,*

v.

R. Q. HICKMAN, Warden; CAL A.
TERHUNE; ERNIE ROE,
          *Respondents-Appellees.*

No. 06-15776

D.C. No.
CV-01-00643-JKS

OPINION

Appeal from the United States District Court
for the Eastern District of California
James K. Singleton, Chief District Judge, Presiding

Argued and Submitted
October 15, 2007—San Francisco, California

Filed April 9, 2008

Before: Robert R. Beezer, Stephen S. Trott, and
N. Randy Smith, Circuit Judges.

Opinion by Judge Beezer

3657

## COUNSEL

Cliff Gardner, Oakland, California, for petitioner-appellant Joshua Richter.

Ann C. McClintock, Assistant Federal Defender, Sacramento, California, for petitioner-appellant Christian Branscombe.

Harry Joseph Colombo, Deputy Attorney General, and John G. McLean, Supervising Deputy Attorney General, Sacramento, California, for the respondents-appellees.

## OPINION

BEEZER, Circuit Judge:

Appellants in these two consolidated cases were jointly convicted of murder, attempted murder, robbery and burglary in California state court. They were sentenced to life in prison without the possibility of parole. In the present action, they appeal the district court's denial of writs of habeas corpus. Appellants allege that they received ineffective assistance of counsel at trial in violation of *Strickland v. Washington*, 466 U.S. 668 (1984). Appellants further allege that the prosecution suppressed exculpatory evidence at trial in violation of *Brady v. Maryland*, 373 U.S. 83 (1963). Appellant Christian Branscombe ("Branscombe") argues that his trial counsel failed to engage in "meaningful adversarial testing" in viola-

tion of *United States v. Cronic*, 466 U.S. 648 (1984). Appellant Joshua Richter ("Richter") alleges that the trial court violated his Eighth Amendment right to a jury trial and Fourteenth Amendment right to due process by providing an incorrect or inaccurate answer to a question of law posed by the jury to the trial court. We affirm the district court's denial of appellants' habeas petitions.

**I**

Joshua Gunner Johnson ("Johnson"), a friend of Richter and acquaintance of Branscombe, lived in a house in Sacramento. On the evening of December 19, 1994, Richter and Branscombe drove to Johnson's house so that Richter could pay Johnson some money he owed him and buy some marijuana from him. Richter and Branscombe were waiting in their car in Johnson's driveway when Johnson returned home, accompanied by Patrick Klein ("Klein") and another individual. Johnson did not recognize the car, and approached the car with his .380 caliber Mac-12 handgun drawn. Upon recognizing the petitioners, Johnson put the Mac-12 away. Johnson, Klein, Richter and Branscombe went into the house, where they socialized for several hours. While they talked, Branscombe cleaned a .32 caliber handgun that he had recently acquired from either Johnson or Johnson's housemate. Richter and Branscombe left Johnson's residence shortly after 2:30 a.m. on December 20, 1994. Klein decided to stay the night.

At trial, appellants and appellee State of California ("the State") presented different accounts of the ensuing events. The State presented evidence that after Richter and Branscombe left, Johnson went to sleep in his bedroom and Klein lay down on the couch in the living room. Johnson woke up early in the morning to find Richter and Branscombe in his bedroom, likely attempting to steal Johnson's gun safe, which was allegedly located in Johnson's bedroom closet. Branscombe shot Johnson, and Johnson later heard gunshots com-

ing from another room. Johnson found Klein lying on the couch bleeding and discovered that his Mac-12 was missing, along with a hip sack that contained $6000 in cash.

Richter and Branscombe presented evidence that they returned to Johnson's residence around 4:00 a.m. so they could give Johnson's housemate certain belongings and wages, and so that Branscombe could return the .32 caliber handgun. Richter stayed in his truck while Branscombe was let into the house by Klein. Shortly thereafter, Richter heard gunshots. He headed toward the house and heard more yelling and gunshots as he approached the front door. Richter saw Klein lying in the doorway to Johnson's bedroom, and found Branscombe "totally freaked out" standing in the middle of the bedroom holding a firearm. Branscombe told Richter that Johnson and Klein had fired at him and tried to kill him. Branscombe picked up the Mac-12 from the floor and told Richter that Johnson or Klein had fired it and had tried to shoot him with it. Branscombe then ran outside and tried to start the truck. Richter panicked and ran back out to the truck. Richter and Branscombe drove away.

Soon after the shootings, Johnson made a 911 call to police. Before police arrived six minutes later, Johnson testified that he made a phone call to his girlfriend's father and took two trips through the house and into the yard to hide his marijuana plants. The police arrived at the house six minutes after Johnson's 911 call. Upon arrival, they encountered a "hysterical" Johnson, who had blood on his cheeks, shirt, hands and right shoulder. The police saw Klein lying on top of a sleeping bag on the living room couch, near death.

A subsequent investigation found two spent .32 casings in the bedroom where Johnson said he had been shot. The investigators found blood on the bed where Johnson said he had been shot, and a pool of blood in the doorway to Johnson's bedroom. Investigators determined that Klein had been shot twice, by a .22 and a .32 caliber bullet. They also found a

spent .32 and a spent .22 casing in the living room near the couch where Klein was lying. Later, while searching Richter's residence, investigators found Johnson's gun safe haphazardly laying on its back. Investigators found a .380 casing in Richter's vehicle which they determined had been ejected from Johnson's Mac-12.

The weapons used to kill Klein and injure Johnson were never found, but investigators examined the bullets fired and casings ejected at the scene. The .22 bullet removed from Klein was a CCI Stinger. The bullet had markings consistent with being ejected from a High Standard Sport King, although investigators could not rule out the possibility that the bullet had been fired from a different .22 caliber firearm. Investigators also found a CCI Stinger brand .22 caliber casing in Johnson's living room, near the couch where Klein was found by the police. The casing had markings consistent with (but not exclusive to) having been fired from a High Standard Sport King. While searching Richter's residence, investigators found a magazine loaded with CCI Stinger brand .22 cartridges. The magazine was identical in size and shape to High Standard magazines designed specifically for a Sport King. An investigator successfully fired a laboratory exemplar High Standard Sport King using the magazine found in Richter's residence.

A California Superior Court jury found Richter and Branscombe guilty of all charges after a trial lasting over three weeks. Following their convictions, Richter and Branscombe appealed to the California Court of Appeal, which affirmed the judgments of the trial court. Appellants filed a petition for review in the Supreme Court of California, which was denied. Appellants sought writs of habeas corpus in the California Supreme Court, which denied their petitions. Appellants timely petitioned for writs of habeas corpus in the United States District Court for the Eastern District of California, which denied the petitions. Appellants sought certificates of appealability from this court, which were granted.

## II

Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), we may not grant a habeas corpus petition unless the state court decision "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States,"[1] or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d). When reviewing a state court's summary denial of a habeas petition, we "look through" the summary disposition to the last reasoned state court decision. *Plascencia v. Alameida*, 467 F.3d 1190, 1198 (9th Cir. 2006). When no state court has explained its reasoning on a particular claim, we conduct "an independent review of the record to determine whether the state court's decision was objectively unreasonable." *Sass v. Cal. Bd. of Prison Terms*, 461 F.3d 1123, 1127 (9th Cir. 2006).

We review a district court's decision to grant or deny a writ of habeas corpus de novo. *Lewis v. Mayle*, 391 F.3d 989, 995 (9th Cir. 2004). We review the district court's findings of fact for clear error. *Bonin v. Calderon*, 59 F.3d 815, 823 (9th Cir. 1995).

## III

Appellants argue that they were denied effective assistance of trial counsel as guaranteed by the Sixth Amendment. Under *Strickland*, petitioners claiming ineffective assistance of coun-

---

[1]A state court decision is "contrary to" clearly established federal law if the state court arrives at a conclusion opposite to that of the Supreme Court of the United States on a question of law, or decides the case differently than the Supreme Court on a set of materially indistinguishable facts. *Williams v. Taylor*, 529 U.S. 362, 405 (2000). A state court decision is an "unreasonable application of" clearly established federal law if the state court identified the correct governing legal rule but unreasonably applied it to the facts at hand. *Id.* at 407.

sel must show both cause and prejudice to prevail on their claim. 466 U.S. at 687.

To show cause, petitioners must demonstrate that counsel's performance at trial was objectively unreasonable, *i.e.*, "outside the wide range of professionally competent assistance." *Id.* at 688, 690. Judicial scrutiny of counsel's performance "must be highly deferential." *Id.* at 689. Counsel is "strongly presumed to have rendered adequate assistance." *Id.* at 690. Courts reviewing counsel's performance "evaluate the conduct from counsel's perspective at the time," to "eliminate the distorting effects of hindsight." *Id.* at 689. Strategic choices made by counsel after thorough investigation are "virtually unchallengeable." *Id.* at 690. A decision not to investigate must be assessed for reasonableness, applying a heavy measure of deference to counsel's judgments. *Id.* at 691.

To show prejudice, petitioners must demonstrate there is a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. "When a defendant challenges a conviction, the question is whether there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt." *Id.* at 695.

## A

Appellants first argue that trial counsel rendered ineffective assistance under *Strickland* by (1) failing to develop and present testimony from firearms evidence experts, (2) failing to develop and present expert testimony to contradict the state's serology evidence and (3) failing to develop and present testimony from pathology experts. Appellants now submit declarations from experts in each of these three areas to support their assertion that they were prejudiced as a result of their counsel's failings.

We need not decide whether appellants' trial counsel acted unreasonably in failing to consult and present experts in fire-

arms evidence, serology and pathology. Even assuming that trial counsels' failure to consult and present such experts was unreasonable, appellants do not show that such failure prejudiced their case.

## 1. Firearms Evidence

Appellants argue that their counsel rendered ineffective assistance by failing to develop and present expert testimony demonstrating that Johnson's Mac-12 firearm was prone to jamming.

At trial, the defense argued that Johnson attempted to shoot Branscombe with his Mac-12, but the weapon jammed because an empty shell failed to eject. Evidence that the Mac-12 had jammed would have bolstered the defense's case by providing a non-incriminating explanation for why Klein had been hit by both a .32 caliber and a .22 caliber bullet. According to the defense's theory at trial, after Johnson's Mac-12 jammed, he grabbed his .22 handgun. While trying to shoot Branscombe with the .22 as Branscombe struggled with Klein, Johnson missed and hit Klein instead. Branscombe then fired his .32 at both Klein and Johnson in self-defense. The theory also provides the defense with an explanation for why an empty shell from the Mac-12 was found in Richter's vehicle: the shell failed to eject when Johnson fired the handgun at Branscombe, but ejected when Richter and Branscombe examined it after leaving the scene of the shootings.

At trial, the State's criminalist, Robert Garbutt ("Garbutt"), testified that he test-fired Johnson's Mac-12 three times without a misfire. On cross-examination, Garbutt testified that modifications Johnson made to the Mac-12 could cause it to "malfunction or fail to fire." Garbutt also testified that he did not know whether these modifications would specifically cause a failure to eject the shell. Garbutt's testimony provided some support for the theory that Johnson accidentally shot Klein with a .22 bullet, but failed to explain why an *empty*

shell, rather than an unfired bullet, was found in Richter's vehicle.

Appellants now submit a declaration of an expert in firearms evidence who would have testified that the type of alterations made to Johnson's Mac-12 "can cause the gun to fail to eject a spent cartridge."

**[1]** Appellants' counsel's failure to have such an expert testify at trial did not prejudice their case. Even had the jury heard the proffered expert's testimony that the Mac-12 *could* jam, there is no reasonable probability that the jury would have accepted appellants' theory that the Mac-12 *did* jam in this case. The proffered expert offers no opinion on the actual likelihood that such a modification would cause the weapon to jam. Garbutt, the State's own expert, admitted at trial that the modifications to Johnson's Mac-12 *could* possibly cause it to fail to fire, but found that the weapon successfully fired each of the three times that he tested it. To accept the appellants' theory, the jury would have had to find that (1) the Mac-12 malfunctioned when Johnson tried to fire it at Branscombe, even though it functioned normally when tested later, (2) the .22 caliber bullet in Klein's body came from a different firearm belonging to Johnson instead of one belonging to Richter, (3) the bullet from Johnson's .22 caliber hit Klein even though Johnson was attempting to shoot Branscombe, (4) Johnson would attempt to fire two different firearms at Branscombe, even though Branscombe had been a social guest in Johnson's house just hours before, (5) Klein would attack or threaten Branscombe in a manner justifying Branscombe's shooting of Klein in self-defense, even though Klein had been the person who let Branscombe into the house minutes earlier and (6) it is mere coincidence that investigators found a magazine in Richter's residence full of .22 CCI Stinger cartridges—the same type as the casing found in Johnson's living room.

**[2]** The totality of the evidence presented at trial weighs strongly against appellants' theory that the Mac-12 jammed

and that Branscombe fired at Klein in self-defense. There is no reasonable probability that the jury would have changed its verdict had they heard additional testimony stating that the Mac-12 could possibly malfunction in some manner.

## 2.  Serology

Appellants argue that their counsel rendered ineffective assistance by failing to develop and present expert testimony regarding the source of the pool of blood in the doorway to Johnson's bedroom. If the pool of blood included blood from Klein, it would indicate that Klein had probably been killed near the doorway, instead of on the living room couch. This would contradict Johnson's testimony that Klein had been shot on the living room couch, and would instead support the defense's theory that Johnson had moved Klein to the couch after the shootings. This would also support the defense's theory that Klein had been shot by an errant bullet from Johnson's .22 caliber as Klein struggled with Branscombe in the vicinity of the bedroom door.

At trial, the State's serology expert testified that evidence taken from a sample of blood in the doorway confirmed that the blood tested came exclusively from Johnson. Appellants now submit the declarations of two serology experts stating that they "could not exclude" the possibility that the blood sample contained a mixture of Johnson's and Klein's blood.

**[3]** There is no reasonable probability that the jury would have rendered a different verdict had defendants' proffered serology experts testified at trial. The serology experts' testimony, even if believed, would not significantly weaken the State's case. All the testimony says is that it is *possible* that the blood sample taken from the bedroom doorway *might* be a mixture of Klein and Johnson's blood, instead of being exclusively Johnson's blood. Because these expert reports do not foreclose the likelihood that the blood from the blood sample came exclusively from Johnson, they do not impeach

Johnson's testimony that the blood came from him alone. The expert reports also do nothing to contradict the weight of the evidence presented at trial that supported the State's theory of the case.

### 3.   Pathology

Appellants argue that their counsel rendered ineffective assistance by failing to consult a pathology expert and present testimony from such an expert at trial. Appellants argue that a pathology expert could have determined whether Johnson's wounds were severe enough for Johnson to have been the only source of the large pool of blood on the floor. Appellants now proffer a declaration from a pathology expert stating that "it is highly unlikely that the blood pool found in the doorway between the bedroom and living room was caused by Mr. Johnson's wounds." The expert's rationale for this conclusion is that Johnson was not bleeding enough, and did not remain in the doorway long enough, to be the sole contributor to the blood pool.

[4] The lack of testimony from the pathology expert at trial did not prejudice the appellants. The reasons the expert provided in reaching his conclusion are flawed and are partially contradicted by the record.

First, the expert states that it is unlikely that Johnson had been bleeding significantly from his shoulder and cheek wounds. The expert bases his conclusion upon the fact that one of the policemen responding to Johnson's 911 call "did not notice that Mr. Johnson was injured until . . . several minutes after first contacting Mr. Johnson" inside the house. This statement of fact, while technically correct, distorts the record. The policeman in question, deputy Michael Wright ("Wright"), testified that, immediately upon entering the house, he noticed that Johnson had blood on him. Wright stated that he noticed blood "on both [of Johnson's] cheeks, blood covering his shirt, . . . blood on his hands, and . . . on

his right shoulder." Wright did not confirm that Johnson's blood came from Johnson's own wounds until several minutes later. It appears from Wright's testimony that there was so much blood on and around Johnson's cheek that Wright did not notice Johnson had been shot in the cheek until Johnson wiped the blood off. Wright's testimony contradicts, rather than supports, the defense expert's conclusion that Johnson was not bleeding enough to be the sole contributor to the blood pool.

Second, the expert states that the amount of blood likely to result from a shoulder wound would likely be minimal. This statement fails to undermine the State's case. The statement does not address the quantity of blood that could be produced by a bullet wound in the cheek. The statement is speculative, and is contradicted by Wright's eyewitness testimony at trial.

**[5]** Third, the expert states that it is unlikely Johnson was standing in the doorway long enough to create the pool of blood. This observation adds little beyond what a lay jury is qualified to observe. The expert does not provide any medical or scientific basis for his conclusion. There is not a reasonable probability that the expert's testimony, based upon the same observations that the jury was qualified to make, would have affected the jury's verdict.

### 4.  Aggregate Impact of the Proffered Testimony

**[6]** *Strickland* requires us to assess the aggregate impact of counsel's alleged failures when evaluating whether such alleged failures prejudiced the defendants. 466 U.S. at 695-96. The proffered testimony from the experts in firearms evidence, serology and pathology, considered in the aggregate, does not demonstrate prejudice. The testimony is not compelling enough to conclude that there is a reasonable probability that the jury would have reached a different verdict had they heard the testimony.

**B**

**[7]** Appellants next argue that their counsel rendered ineffective assistance by failing to consult and present an expert on bloodstain pattern interpretation. We are unconvinced that trial counsels' failure to consult an expert on bloodstain pattern interpretation falls outside the wide range of professionally competent assistance. *See Strickland*, 466 U.S. at 690. Before trial, it was not unreasonable for counsel to fail to understand that an expert in bloodstain pattern interpretation —someone who could testify as to "blood into blood patterns" and "satellite drops" that result from blood falling from a certain height—would be valuable to his case. Counsel highly experienced in trying cases involving bloodstain evidence might well have understood the value of such an expert, but the Sixth Amendment does not guarantee defendants a right to highly experienced counsel. *See id*. at 688, 690.

Richter's defense counsel, Mark Axup ("Axup") stated that he was surprised by the State's decision at trial to call a detective as an expert on blood spatter evidence. The detective, Robert Bell ("Bell"), had investigated the homicide of Klein. Defense counsel had expected Bell to testify, but not as an expert in bloodstain pattern interpretation. The State made a last-minute decision to ask Bell to testify about the blood spatter evidence.

By the time Bell had testified, the trial was well underway and Axup later stated that defense counsel had little to no time to delve into the specifics of bloodstain pattern science. Given the circumstances, it was reasonable for counsel to not spend time attempting to locate and consult potential rebuttal experts, particularly since it was not clear that such an expert would disagree with the opinion of the State's expert. Defense counsel's failure to call an expert on bloodstain pattern interpretation did not fall below the low threshold of performance required by *Strickland*.

## C

**[8]** Richter argues that Axup provided ineffective assistance by failing to call several lay witnesses to testify at trial. Richter argues that the testimony of these witnesses would have supported Richter's claim that Johnson's gun safe was legitimately in Richter's residence at the time of the shootings. If the jury believed this claim, Richter and Branscombe could not have entered Johnson's house with the motive to steal the safe.

Axup called one witness at trial, Stephanie Edwards ("Edwards"), to support Richter's claim. Edwards testified that she saw the gun safe inside Richter's residence on several occasions, including two days before the shootings. Johnson testified at trial that he had kept his safe at Richter's residence for one or two weeks, but that he had moved the safe to his house at the end of November or the beginning of December. Scott Brown testified that he had helped Johnson move the safe from Richter's residence to Johnson's house during the first or second week of December.

The district court found that Axup made a tactical decision not to call the additional witnesses in question. This finding is not clearly erroneous. Axup testified in his 2004 deposition that he believed the State's cross-examination of these additional witnesses would harm their credibility, and that calling the witnesses would not be in the best interest of his client. The fact that, nearly nine years after trial, Axup could not recall the exact reasons why he believed that the witnesses were not credible does not mean that Axup had no basis for his decision at the time he made it. Axup had already called one witness who testified that the safe was in Richter's residence before the shootings. Axup's tactical decision not to call the other lay witnesses was not unreasonable. *See Strickland*, 466 U.S. at 690 (stating that strategic choices made by counsel after thorough investigation are "virtually unchallengeable").

**D**

**[9]** Richter argues that Axup provided ineffective assistance of counsel by not investigating whether it was possible to retrieve a fragment of floorboard with a bullet hole in it. The floorboard came from Johnson's bedroom. Johnson testified that he made the hole when he accidentally fired his .22 caliber firearm while cleaning it a couple of weeks before the shootings. During trial, the prosecutor sent Investigator Brian Maloney ("Maloney") to investigate the bullet hole. Maloney photographed the hole with a measuring device next to it, and then cut out the piece of floorboard with the hole in it in an attempt to find the bullet. The floorboard fell into the crawl space beneath the house. Maloney testified at trial that the crawl space was inaccessible, and therefore he could not retrieve the floorboard. Maloney testified that he believed the hole was consistent with the size of a .22 caliber bullet.

After trial, Richter's father discovered that the crawl space was accessible. He retrieved the floorboard and gave it to Axup, who gave it to a firearms evidence expert, James Aiello ("Aiello"), for testing. Aiello determined that the hole was probably caused by a .380 caliber firearm, rather than a .22 caliber. This conclusion, if known at trial, would have given some support to the defense's theory that Johnson fired the .380 caliber Mac-12 at Branscombe on the night of the shooting. It also would have contradicted Johnson's testimony that he created the hole while cleaning his .22 caliber.

Axup's decision not to attempt to recover the floorboard was reasonable given the circumstances. Maloney testified under oath at trial that the floorboard was inaccessible, and Axup had no reason to disbelieve him. Given Maloney's testimony that the hole was consistent in size with one created by a .22 caliber bullet, Axup could reasonably believe that, even were it possible to retrieve the floorboard, the evidence would be inculpatory, not exculpatory. Further, Maloney did not cut out the floorboard until a week after the start of trial. Consid-

ering the considerable time pressures during this trial and Maloney's testimony that the floorboard was inaccessible, Axup's decision not to search for the floorboard was reasonable.

**IV**

Appellants argue that the prosecution suppressed exculpatory evidence at trial in violation of *Brady v. Maryland*, 373 U.S. 83 (1963). Appellants allege that the *Brady* violation occurred when Maloney lost the floorboard containing the bullet hole in the crawl space and incorrectly testified that there was no possible way to retrieve it.

**[10]** It is well-established under *Brady* and its progeny that the State violates due process when it suppresses or fails to disclose material exculpatory evidence. *See Illinois v. Fisher*, 540 U.S. 544, 547 (2004); *Brady*, 373 U.S. at 87. The Supreme Court limited *Brady*'s reach in *California v. Trombetta*, 467 U.S. 479 (1984) and *Arizona v. Youngblood*, 488 U.S. 51 (1988). *Trombetta* holds that, for the *Brady* standard to apply, "evidence must . . . possess an exculpatory value that was apparent *before* the evidence was destroyed." 467 U.S. at 489 (emphasis added); *see also Youngblood*, 488 U.S. at 56 n.\*. *Youngblood* holds that the State's failure to preserve "potentially useful" evidence does not constitute a due process violation unless the defendant can show bad faith on the part of the police. 488 U.S. at 58; *see also United States v. Estrada*, 453 F.3d 1208, 1212 (9th Cir. 2006) (drawing a distinction between "potentially exculpatory" and "apparently exculpatory" evidence).

*Trombetta* and *Youngblood* both involve evidence that the police permanently lost or destroyed before its inculpatory or exculpatory value could be conclusively determined. In both cases, the police had no reason to believe that the evidence would be exculpatory at the time the evidence was destroyed.[2]

---

[2]In *Trombetta*, the Supreme Court determined that the State did not violate due process when it failed to preserve samples of respondents' breath

Here, similar to *Trombetta* and *Youngblood*, Maloney and the prosecutor did not believe that the floorboard would be exculpatory evidence at the time that it fell into the crawl space beneath the house. In contrast to *Trombetta* and *Youngblood*, however, the evidence at issue here was recovered after trial and was found to have exculpatory value.

[11] We have not yet specifically addressed whether the rules announced by the Supreme Court in *Trombetta* and *Youngblood* apply in the unusual factual situation presented here. By their own terms, *Trombetta* and *Youngblood* apply in situations where, as here, the police did not believe evidence to have exculpatory value when it was lost or misplaced, even if the evidence is later recovered and determined to be exculpatory.

[12] The Supreme Court made clear in *Trombetta* and *Youngblood* that the dispositive issue for due process purposes is the state of mind of police or prosecutors at the time the evidence is lost or destroyed. *See Youngblood*, 488 U.S. at 56 n.*; *Trombetta*, 467 U.S. at 488-89.[3] The Supreme Court

in cases where respondents were convicted of drunk driving. 467 U.S. at 491. The respondents claimed that, had the breath samples been preserved, they would have been able to impeach the incriminating test results. *Id.* at 483. The Court held in *Youngblood* that the failure of the police to preserve semen on clothing that could have potentially exculpated the defendant of sexual assault charges did not violate due process. 488 U.S. at 58. The defendant alleged that he had been misidentified as the perpetrator. *Id.* at 54. The Court held that, absent a showing of bad faith, police do not violate due process when they fail to disclose or preserve "evidentiary material of which no more can be said than that it could have been subjected to tests, the results of which might have exonerated the defendant." *Id.* at 57.

[3]In *Youngblood*, for example, the Supreme Court focused specifically on the police officers' state of mind at the time the evidence was lost: "Here, respondent has not shown that the police knew the semen samples would have exculpated him *when they failed to . . . refrigerate the boy's clothing*; this evidence was simply an avenue of investigation that might have led in any number of directions." 488 U.S. at 56 n.* (emphasis added).

reached this conclusion based upon their stated "unwillingness to read the . . . Due Process Clause as imposing on the police an undifferentiated and absolute duty to retain and to preserve all material that might be of conceivable evidentiary significance in a particular prosecution." *Youngblood*, 488 U.S. at 58 (citation omitted). The Supreme Court did not approve a constitutional standard where acceptable management of evidence by law enforcement could retroactively be found unconstitutional if, after trial and conviction, a defendant shows that the evidence would have been exculpatory. The post-trial retrieval of the floorboard does not entitle appellants to a retroactive determination that Maloney violated appellants' due process rights by inadvertently losing or misplacing the evidence.

**[13]** Applying the *Trombetta-Youngblood* rule here, we find no evidence in the record of bad faith on the part of Maloney or the prosecution. Maloney testified that he believed the floorboard to be in an inaccessible location after he cut it out of the floor in Johnson's residence. The prosecution fully disclosed the nature and location of the evidence. At worst, Maloney's actions could be described as negligent. Appellants were not denied due process of law, and the state court's denial of habeas relief on this ground was not an unreasonable application of federal law.

## V

**[14]** Branscombe argues that his trial counsel, Thomas Dixon ("Dixon"), failed to subject the prosecution's case to meaningful adversarial testing in violation of *United States v. Cronic*, 466 U.S. 648 (1984). In *Cronic*, the Supreme Court identified three situations where the Court does not require a showing of prejudice to establish a violation of the Sixth Amendment right to counsel. *See id.* at 658-61. These situations include (1) where there has been a complete denial of counsel at a critical stage of trial, (2) where counsel "entirely fails to subject the prosecution's case to meaningful adver-

sarial testing" and (3) where "surrounding circumstances made it . . . unlikely that any lawyer could provide effective assistance." *Id.* at 659-61. The Supreme Court later emphasized that *Cronic*'s exception for failing to test the prosecution's case applies only when the attorney's failure to do so is complete. *Bell v. Cone*, 535 U.S. 685, 697 (2002). An attorney's failure to oppose the prosecution at specific points during the trial does not rise to the level of a *Cronic* violation. *See id.* Rather, the attorney's failure must implicate the proceeding as a whole. *United States v. Thomas*, 417 F.3d 1053, 1057 (9th Cir. 2005) (citing *Bell*, 535 U.S. at 697).

**[15]** Branscombe argues that Dixon's lack of investigation and preparation for trial resulted in a failure to subject the prosecution's case to meaningful adversarial testing. We are not persuaded that Dixon's lackluster preparation for trial resulted in a complete failure to contest the prosecution's case. To the contrary, the record shows that Dixon engaged in adversarial testing on numerous occasions throughout trial. As the district court and the state appellate court noted, Dixon cross examined most of the witnesses, successfully moved to suppress statements and strike testimony, successfully moved to exclude evidence and had a witness perform a demonstration. Dixon also asked several questions of Richter at trial to support the theory that Branscombe had returned to Johnson's house to give Johnson a firearm, and had fired the weapon in self-defense. Dixon's participation at trial demonstrates that he did not entirely fail to subject the prosecution's case to meaningful adversarial testing.[4]

---

[4]We agree with the State that Branscombe's *Cronic* claim is unexhausted. Branscombe did not present to the California state courts the "substantial equivalent" of the claim presented in federal court. *Lopez v. Schriro*, 491 F.3d 1029, 1040 (9th Cir. 2007). The factual basis for Branscombe's current *Cronic* claim rests primairly upon new evidence that the California state courts did not have the opportunity to consider on direct review. The State did not expressly waive its exhaustion defense before the district court. The State may therefore raise the defense here, even

## VI

Richter alleges that the trial court violated his Eighth and Fourteenth Amendment rights by providing an incorrect or inaccurate answer to a request for clarification that the jury submitted to the trial court during deliberations. The jury requested the following clarification from the trial court: "If a defendant is found to have aided & abetted in [robbery], is he guilty of all charges (or can you find him guilty of lesser charges) as found for the other defendant." The trial court responded "yes" (*i.e.*, that the defendant is guilty of all charges), over defense counsel's objections. Richter argues that this response was an incorrect statement of California law, that this error violated Richter's rights to a jury trial and to due process of law and that a writ of habeas corpus must issue as a result.

To obtain habeas relief following an erroneous response to a jury's request for clarification, a petitioner must show that (1) the response was an incorrect or inaccurate application of state law, (2) constitutional error resulted and (3) the error was not harmless. *See Morris v. Woodford*, 273 F.3d 826, 833 (9th Cir. 2001). To determine whether constitutional error occurred, we ask "whether there is a reasonable likelihood that the jury has applied the challenged instruction in a way that violates the Constitution." *Estelle v. McGuire*, 502 U.S. 62, 72 (1991) (internal quotations and citation omitted). In other words, constitutional error occurs when (1) there is a reasonable likelihood that the jury understood the trial judge's response to a request for clarification as stating a certain rule of law, (2) that rule, as potentially understood by the jury, was

though the district court did not address the exhaustion issue. *See* 28 U.S.C. § 2254(b)(3). We deny Branscombe's unexhausted petition on the merits. *See* 28 U.S.C. § 2254(b)(2). For the reasons stated above, we find it perfectly clear that Branscombe does not raise even a colorable *Cronic* claim. *See Cassett v. Stewart*, 406 F.3d 614, 623-24 (9th Cir. 2005).

incorrect or inaccurate and (3) the rule, so understood, was unconstitutional as applied to the defendant. *See Calderon v. Coleman*, 525 U.S. 141, 147 (1998). In attempting to determine what the jury understood the response to mean, the response "may not be judged in artificial isolation, but must be considered in the context of the instructions as a whole and the trial record." *Estelle*, 502 U.S. at 72 (internal quotations and citation omitted).

To determine whether the error was harmless, we consider whether the error had a "substantial and injurious effect or influence on the jury's verdict." *Calderon*, 525 U.S. at 147. "If we are in grave doubt as to whether the error had such an effect, the petitioner is entitled to the writ." *Morris v. Woodford*, 273 F.3d 826, 833 (9th Cir. 2001) (internal quotations and citation omitted).

**[16]** The trial court's response to the jury's request for clarification could be interpreted as an inaccurate statement of California law. The jury's request and the trial court's answer (referred to hereafter as the "colloquy") created an ambiguity. The most natural reading of the colloquy is that it correctly states California's felony murder rule: when a defendant aids and abets a robbery, and someone is killed during the robbery, the defendant is guilty of both robbery and murder, even if his accomplice does the killing. *See People v. Washington*, 402 P.2d 130, 134 (Cal. 1965). But the colloquy goes further. It permits the jury to conclude that a defendant who aids and abets a robbery-murder must be found guilty of robbery and murder even if he does not begin to aid or abet the robbery until after the murder has already occurred. This interpretation of the colloquy results in an incorrect statement of California law. California permits a defendant who aids and abets a robbery to be found guilty of felony murder only if he began his aiding and abetting *before* the commission of the killing. *See People v. Pulido*, 936 P.2d 1235, 1236 (Cal. 1997).

**[17]** Constitutional error did not result because it is not reasonably likely that the jury interpreted the colloquy in a man-

ner that misstates the law. In phrasing the request for clarification the way they did, it is unlikely that the jury was attempting to determine whether someone who began to aid and abet a robbery only after a murder had been committed must be found guilty of the murder. If the jury were intending to pose such a question to the judge, they likely would have done so in a more direct manner. The manner in which the question was phrased strongly suggests that the jury was asking for a clarification of the felony murder rule for accomplices, as described above. Given the question that the jury was posing to the trial judge, it is not reasonably likely that the jury understood the response to mean anything more than a straightforward and accurate statement of California's felony murder rule.

Even if the trial court did commit constitutional error, the error was harmless. For the error to have an injurious effect or influence in determining the jury's verdict, the jury must have believed that Branscombe committed robbery and murdered Klein, but that Richter did not begin to aid or abet the robbery until after the murder occurred. To believe this, the jury would have to have found, based on the facts presented to them at trial, that (1) Richter had no intention of robbing Johnson (or of helping Branscombe rob Johnson) when he and Branscombe drove to Johnson's house around 4:00 that morning, (2) Branscombe, unbeknownst to Richter, decided to rob Johnson and shoot Klein, (3) after Klein was shot, Richter decided to aid and abet Branscombe in committing the robbery. Neither the State nor the defendants argued such a theory of the case. Such a conclusion would go against significant evidence presented at trial, including the evidence showing that Richter owned the same type of bullets used to shoot Klein. This conclusion would also be inconsistent with the testimony of *both* Richter and Johnson. It is unlikely that any member of the jury arrived at this conclusion.

**[18]** Because the trial court did not commit constitutional error, and because any error would have been harmless, Richter is not entitled to a writ of habeas corpus on this claim.

## VII

We affirm the district court's denial of Richter and Branscombe's petitions for writs of habeas corpus.

**AFFIRMED.**